**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

JENNIFER CHRISTIAN, FKA Jennifer Havemen,

*Plaintiff-Appellant*,

v.

UMPQUA BANK,

*Defendant-Appellee.*

</td>
<td>

No. 18-35522

D.C. No.
3:16-cv-01938-BR

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted November 5, 2019
Portland, Oregon

Filed December 31, 2020

Before: Richard A. Paez and Johnnie B. Rawlinson,
Circuit Judges, and Leslie E. Kobayashi,* District Judge.

Opinion by Judge Paez

---

*The Honorable Leslie E. Kobayashi, United States District Judge for the District of Hawaii, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

The panel reversed the district court's grant of summary judgment in favor of defendant Umpqua Bank on claims of gender harassment brought under Title VII and the Washington Law Against Discrimination by a former Umpqua employee who alleged that a bank customer stalked and harassed her in her workplace and that Umpqua failed to take effective action to address the harassment.

The panel held that to establish sex discrimination under a hostile work environment theory, a plaintiff must show she was subjected to sex-based harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment. The panel concluded that a trier of fact could find that the harassment altered the conditions of plaintiff's employment, and the district court erred in failing to consider harassing incidents together, in declining to consider incidents in which plaintiff did not have any direct, personal interactions with the customer, and in neglecting to consider record evidence of interactions between the customer and third persons. The panel further concluded that there were genuine issues of material fact whether Umpqua either ratified or acquiesced in the harassment by failing to take prompt, appropriate, and effective action.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed the district court's grant of summary judgment and remanded for further proceedings.   It addressed plaintiff's retaliation claims in a concurrently filed memorandum disposition.

## COUNSEL

Nadia H. Dahab (argued), Stoll Stoll Berne Lokting & Shlachter P.C., Portland, Oregon, for Plaintiff-Appellant.

Steven Caplow (argued) and Rachel H. Herd, Davis Wright Tremaine LLP, Seattle, Washington, for Defendant-Appellee.

Philip Matthew Kovnat (argued) and Anne W. King, Attorneys; Sydney A.R. Foster, Assistant General Counsel; Jennifer S. Goldstein, Associate General Counsel; James L. Lee, Deputy General Counsel; Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae Equal Employment Opportunity Commission.

## OPINION

PAEZ, Circuit Judge:

Jennifer Christian, a former employee of Defendant Umpqua Bank ("Umpqua"), appeals the district court's order granting summary judgment on her claims of gender harassment and retaliation under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination.   Christian alleges that a bank customer stalked and harassed her in her workplace and that Umpqua

failed to take effective action to address the harassment.**[1]**
The district court granted summary judgment in favor of
Umpqua, holding that no reasonable juror could conclude
that (1) the harassment Christian endured was so severe or
pervasive as to create a hostile work environment or that
(2) Umpqua ratified or acquiesced in the harassment. We
have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I.

Christian began working for Umpqua in 2009 as a
Universal Associate. She received generally favorable
performance reviews, and was twice promoted, most
recently in 2014 to Universal Associate III. At the time of
the harassment at issue in this litigation, she worked at
Umpqua's Downtown Vancouver branch (the "Downtown
branch").

In late 2013, a customer ("the customer") asked
Christian to open a checking account for him.**[2]** The
interaction was unremarkable, and Christian did not feel
threatened or afraid while meeting him. Soon, however, the
customer began visiting the bank to drop off "small notes"
for Christian. The notes stated that Christian was "the most
beautiful girl he'[d] seen" and that the customer "would like
to go on a date" with her. Christian began to feel

---

**[1]** Christian also alleges that Umpqua retaliated against her for
complaining about the harassment and Umpqua's response to it. Her
appeal of the district court's grant of summary judgment on her
retaliation claims is addressed in a concurrently filed memorandum
disposition.

**[2]** Because Christian is the non-movant, we construe the facts in the
light most favorable to her. *See Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986).

"concerned," as did her colleagues. Christian's "lead supervisor," Anna Mishuk, advised her to "watch out, you know, that it doesn't escalate."**[3]**

When Christian next saw the customer at the bank, she told him, "I'm not going to go on a date with you." He responded, "okay," and left the bank. Yet his behavior continued. In early February 2014, he sent Christian a long letter stating that she "was the most beautiful woman he's ever seen, that . . . [she] was his dream girl, that [they] were meant to be together, [and] that he wanted to be with [her]." Christian found the letter "disturbing" because it was "affectionate and personal" yet she "barely knew the person sending it." She showed the letter to her manager, Chris Sanseri ("Sanseri"),**[4]** corporate trainer Shawnee Effinger ("Effinger"), and other colleagues. Effinger and her other colleagues warned her to be careful.

Around the same time, Christian learned from employees at Umpqua's Esther Short Park branch (the "Esther Short branch") that the customer had "been in [to the branch] several times . . . asking [the employees] over and over . . . how he was going to get a date with [Christian]." The employees were "concerned," felt that the customer's conduct was "getting creepy," and warned Christian "that this was potentially extremely dangerous for [her]." Effinger advised Christian to call the police. Christian became increasingly concerned for her safety.

---

**[3]** Although Christian did not remember whether she told her manager, Chris Sanseri, about these initial notes, she believed that Mishuk mentioned them to Sanseri.

**[4]** The parties do not dispute that Sanseri was Christian's manager.

On Valentine's Day of 2014, the customer sent Christian flowers and a card. Christian felt threatened because "I [didn't] know him on a personal level, and he had sent inappropriate letters and notes talking about how . . . we were meant to be together, we were soulmates." Christian, Effinger, and Mishuk showed Sanseri the letter and card and told him, "This is disturbing." Effinger told Sanseri that "this was a dangerous situation for [Christian]." Christian later recalled that Effinger "had to explain to [Sanseri] that these letters were alarming and that several people were concerned for [Christian's] safety."

Christian told Sanseri that she did not want the customer to be allowed to return to the bank. According to Christian, Sanseri promised her that he would not allow the customer to return but never in fact communicated that decision to the customer. Instead, according to Christian's deposition testimony, Sanseri asked her to call the customer to tell him that it was inappropriate to send her flowers. Christian felt uncomfortable calling the customer, but agreed to do so because she felt that Sanseri "didn't seem like he wanted to deal with it." She telephoned the customer and informed him it was inappropriate to send her flowers and that she was not going to go on a date with him. She told him to stop asking her on dates and to stop asking her colleagues at the Esther Short branch about how to get a date with her. The customer said "okay."

The customer did not stop. Several days later, he hand-delivered another letter for Christian to the Downtown branch. This letter stated that he and Christian were "meant to be together" and were "soulmates." Christian showed the letter to Sanseri, Mishuk, and several other colleagues.

Christian did not have any direct contact with the customer again until September 2014. But the customer

"continue[d] to go into [the] Esther Shor[t] [branch] and ask about [Christian]" and "badger[] [Christian's colleagues] about how he was going to get a date with [Christian]." Christian's colleagues informed her that the customer continued to ask about her. Ultimately, the Esther Short branch closed the customer's account because he was "wasting their time[,]" "badgering them constantly[,]"and "didn't have any money."

In September 2014, Christian and Sanseri volunteered on behalf of Umpqua at a charity event for homeless community members. While Christian was scooping ice cream in the ice cream truck, she noticed the customer "sitting on the wall of the building" staring at the truck for twenty to thirty minutes. Christian felt threatened, and told the other volunteers in the truck "that [the customer] was present and asked them to watch out for [her] safety because [she] was afraid of what he might do."[5]

Within a few days of the charity event, the customer returned to the Downtown branch to reopen his account. Rather than ask the customer to leave, Sanseri instructed Christian to open the new account for him. Christian felt uncomfortable and reminded Sanseri that he had promised her the customer would not be allowed to return to the bank. Sanseri responded, "I don't really remember any of that,

---

[5] It is unclear when Sanseri became aware of this incident. Christian testified that she did not believe she informed Sanseri of the incident at the time. By contrast, Sanseri, at his deposition, seemingly testified that Christian did inform him of the incident at the time. *See* Excerpts of Record 189 ("I got there [to the charity event], I'm going to say, around twelve or one. The event goes until three. And Jennifer had mentioned that she saw [the customer] at the event."); Excerpts of Record 193 ("I do remember asking her if they exchanged words [at the event]. There was [sic] no words exchanged.").

Jennifer, and I'll just get [another associate] to do it," causing her to feel "upset and scared." While the customer was assisted by another associate, he stared at Christian.

The following day, Christian went to work "filled with fear and overwhelming anxiety that [the customer] would come back" to the bank. A few days later, he did return. Although "he had no apparent banking business to do," the customer sat in the bank lobby for 45 minutes to one hour, staring at Christian. Christian "became filled with fear and sick to [her] stomach" and "froze up while helping [another] customer." She asked that customer to stay with her until he left.

Afterward, Christian informed a regional manager of another region, Dan Souvenier, of the situation. Souvenier told her, "Don't worry. This is an easy fix. We can close his account in 20 minutes . . . . [W]e can get this fixed today so he's not allowed to come in the bank anymore." Christian also telephoned and left voicemail messages with the regional manager for her region, Bobbi Heitschmidt ("Heitschmidt"), and a Human Resources representative, Kris Wolfram ("Wolfram"), seeking assistance.

The following Monday and Tuesday, Christian called out sick due to stress and anxiety, and refused to return to work at the Downtown branch until a no-trespassing order was implemented to bar the customer from visiting the bank. Sanseri instructed Christian to return to work and directed her to "just hide in the break room" if the customer visited the bank. Later that same week, Christian met with Heitschmidt, Wolfram, and Sanseri, who again suggested that she "hide in the break room during the times when [the customer] would come into the Bank." They also asked Christian if she wanted to transfer to a different bank branch location.

Shortly thereafter, Christian requested in writing that the bank close the customer's bank account and obtain a no-trespassing order against him.  Christian also asked to be transferred to another Umpqua location, the Salmon Creek branch.  Although she was aware that there was only a 25-hour per week position available at that location—fewer than her 32-hour per week position at the Downtown branch—Christian stated that she was "willing to [accept] those hours even with the financial burden I will encounter because I need to work in a safe environment and because I feel you have given me no other options . . . . I can only feel that I am being punished for the mistake of others at Umpqua."

Umpqua closed the customer's account and told him not to return to the bank.  Umpqua also temporarily transferred Christian to a different Umpqua location, the Evergreen Square branch, before finally transferring her to the Salmon Creek branch several weeks later.  Soon after, Christian resigned her position, stating in an email that she was leaving because her "doctor has declared it is bad for [her] health to continue working at Umpqua Bank."

After obtaining a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC"), Christian filed suit in state court, alleging gender discrimination and retaliation in violation of state and federal law.  Umpqua removed the suit to federal court and moved for summary judgment, which the district court granted.  Christian timely appealed.[6]

---

[6] Umpqua seeks to strike a portion of Christian's reply brief, which Umpqua contends introduces "a new theory and evidence that . . . [the] customer had engaged in 'characteristic stalking behavior.'"  Dkt. 49. Because we do not rely on the challenged portions of the reply brief, we deny the motion to strike as moot.

## II.

We review de novo the district court's grant of summary judgment. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088 (9th Cir. 2008). "[W]hether the plaintiff has established that she or he was subjected to a hostile work environment, and whether the employer is liable for the harassment that caused the environment" presents "mixed questions of law and fact that we review *de novo*." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2001), *as amended* (Jan. 23, 2002). Viewing the evidence in the light most favorable to Christian, the non-movant, "we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1033 (9th Cir. 2005). "We do not weigh the evidence or determine whether the employee's allegations are true." *Davis*, 520 F.3d at 1088.

## III.

Title VII and its state counterpart, the Washington Law Against Discrimination ("WLAD"),[7] prohibit sex discrimination in employment. *See* 42 U.S.C. § 2000e *et seq.*; Wash. Rev. Code. § 49.60.180(3). Recognizing that "[a] discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep

---

[7] The district court treated the federal and state claims as functionally identical, an approach Christian replicates in her briefing on appeal. (Umpqua does not address the state claims in its brief at all.) "Because Washington sex discrimination law parallels that of Title VII," we, too, consider Christian's federal and state claims together. *Little*, 301 F.3d at 966; *see also Blackburn v. State*, 375 P.3d 1076, 1080 (Wash. 2016) (en banc).

them from advancing in their careers," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993), Congress enacted "Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women." *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir. 1990)).

To establish sex discrimination under a hostile work environment theory, a plaintiff must show she was subjected to sex-based harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment. *See Little*, 301 F.3d at 966; *Antonius v. King Cty.*, 103 P.3d 729, 732 (Wash. 2004) (en banc). At issue here is only whether the harassment Christian suffered was severe or pervasive and whether Umpqua is liable for it.

## A.

To determine whether the conduct was sufficiently severe or pervasive, "[w]e must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Davis*, 520 F.3d at 1095 (quoting *Harris*, 510 U.S. at 23). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Ellison*, 924 F.2d at 878)).

The district court held that Christian's harassment claims failed as a matter of law because no reasonable juror could conclude the customer's conduct was severe or pervasive

enough to create a hostile work environment. The court declined to consider much of the record evidence of misconduct because "seven months elapsed between" the harassment occurring in February 2014 and that occurring in September 2014, and because many of the incidents did not involve "direct, personal interactions" between Christian and the customer. Thus, the court accepted only one incident as actionable harassment—the customer's visit to the bank in September 2014 to reopen his account—and concluded that, "[w]ithout more, . . . this single incident is not sufficient to constitute a hostile workplace." The district court erred in three respects.

First, the court erred in isolating the harassing incidents of September 2014 from those of February 2014. They should be evaluated together. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998), and "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998). The harassment Christian endured in February involved "the same type" of conduct, "occurred relatively frequently," and was perpetrated by the same individual as the harassment in September 2014.[8] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120–21 (2002). Christian understandably experienced the harassment not as isolated and sporadic incidents but rather as an escalating pattern of behavior that

---

[8] Moreover, as discussed below, the harassment did not in fact cease between February and September 2014.

caused her to feel afraid in her own workplace. We cannot say that a juror would not find that fear reasonable or the resulting environment hostile. The district court's overly narrow approach—which ignored the reality "that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations"—was error. *Draper*, 147 F.3d at 1108 n.1.

Second, the district court erred in declining to consider incidents in which Christian "did not have any direct, personal interactions with the [c]ustomer," such as when he wrote her a letter describing her as his "soulmate," sent her flowers, and watched her in the bank lobby. Title VII imposes no such requirement. In *Ellison*, for instance, we concluded that a letter sent to the plaintiff by her co-worker describing how he "had been 'watching' and 'experiencing' her" was actionable harassment. 924 F.2d at 880. That the plaintiff received the letter in the mail while on an out-of-state business trip—far from her harasser—had no bearing on our analysis. *Id.* at 874. Our obligation is to "consider all the circumstances," *Davis*, 520 F.3d at 1095, including those incidents that do not involve verbal communication between the plaintiff and harasser, physical proximity, or physical or sexual touching.[9]

---

[9] Because the district court repeatedly emphasized that the customer "did not attempt to touch Plaintiff physically," we underscore that gender-based harassment, like any other form of harassment, need not involve physical or sexual touching in order to be actionable under Title VII. *See, e.g., Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1527–28 (9th Cir. 1995), *as amended* (Apr. 24, 1995) (finding conduct actionable that involved repeated phone calls and physical threats but no physical touching); *Frazier v. Delco Elecs. Corp.*, 263 F.3d 663, 664–65 (7th Cir. 2001) (same, with respect to stalking conduct that involved no physical touching); *see also Equal Emp. Opportunity Comm'n v. Costco*

Finally, the district court erred in neglecting to consider record evidence of interactions between the customer and third persons, such as the customer's repeated visits to the Esther Short branch to "badger[] [Christian's colleagues] about how he was going to get a date with [Christian]." "Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile." *Davis*, 520 F.3d at 1095; *see also Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1198, 1202 (9th Cir. 1991) (concluding the harassment was sufficiently severe or pervasive, even though the plaintiff "heard about most of the incidents through other employees," rather than being directly targeted); *Dominguez-Curry*, 424 F.3d at 1036. Christian learned from her colleagues that the customer was persistently contacting them to obtain information about her. That she did not witness the customer's conduct firsthand is no matter:  She heard his message loud and clear.  Where, as here, a plaintiff becomes aware of harassing conduct directed at other persons, outside her presence, that conduct may form part of a hostile environment claim and must be considered.

Viewing all the evidence in the light most favorable to Christian, we conclude that genuine disputes of material fact exist as to the severity or pervasiveness of the harassment such that a jury could find in Christian's favor.  As in *Ellison*, the customer—"a person [Christian] barely knew," 924 F.2d at 880—repeatedly pestered her, asked her on dates, and sent her notes and letters declaring that they were "soulmates" and "were meant to be together."  As in *Ellison*, the customer persisted for many months in his unwelcome conduct after Christian asked him to stop.  *Id.*  And, like in *Ellison*,

_____

*Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) ("[Actionable harassment] need not consist of . . . intimate touching.").

Christian was terrorized not only by the customer's bizarre and erratic behavior in and of itself but also by its unknown potential to escalate. *See* Excerpts of Record at 499 ("I worried what would come next and if his pursuit of me would escalate to something physical."); *Ellison*, 924 F.2d at 874 ("I thought he was nuts. I didn't know what he would do next. I was frightened."). Christian's colleagues also feared for her safety and repeatedly warned her to be careful—further bolstering the reasonableness of her reaction to the stalking. *Ellison*, 924 F.2d at 879 (adopting reasonable woman standard). The evidence is more than sufficient to create a triable issue as to whether the harassment was sufficiently severe or pervasive to alter the conditions of Christian's employment.

Because we conclude that a trier of fact could find that the harassment altered the conditions of Christian's employment and created an abusive working environment, we turn to the question of Umpqua's liability.

## B.

"[A]n employer may be held liable for sexual harassment on the part of a private individual, such as [a customer], where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997).[10]   "[T]he employer's corrective measures

---

[10] Though the WLAD's co-worker liability standard mirrors that of Title VII, *see Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 712 (Wash. 1985) (en banc), we are not aware of any Washington Supreme Court decision addressing whether the WLAD subjects employers to liability for harassment by non-employees, such as customers or clients. The only appellate court to consider the question answered in the

must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, *inter alia*, the employer's ability to stop the harassment and the promptness of the response." *Freitag v. Ayers*, 468 F.3d 528, 539–40 (9th Cir. 2006), *as amended* (Nov. 3, 2006) (internal quotation marks omitted). Effectiveness is measured not only by ending the current harassment but also by "deterring future harassment—by the same offender or others. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Fuller*, 47 F.3d at 1528–29 (internal citation omitted).

Here, the district court held that no reasonable juror could conclude that Umpqua ratified or acquiesced in the harassment. The court reasoned that, "[w]hen advised of the incidents involving the [c]ustomer, Defendant immediately responded to Plaintiff's concerns," both initially in February 2014 and again in September 2014. We disagree. A jury reasonably could find that Umpqua ratified or acquiesced in the harassment in February 2014, September 2014, or both.

First, whether Umpqua took prompt, appropriate, and effective action in February presents a genuine issue of

---

affirmative and adopted Title VII's non-employee liability standard. *See LaRose v. King Cty.*, 437 P.3d 701, 714 (Wash. Ct. App. 2019) ("[E]mployers may be subject to liability for harassment of their employees in the workplace, even harassment by nonemployees . . . . [A] nonemployee's harassment of an employee in the workplace will be imputed to an employer if the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action.") (internal quotation marks and citation omitted). In the absence of contrary authority, we construe the employer liability standards under Title VII and the WLAD to be functionally identical. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940); *Torrance Nat'l Bank v. Aetna Cas. & Sur. Co.*, 251 F.2d 666, 669 n.6 (9th Cir. 1958).

material fact.  Although the district court credited Umpqua with "decid[ing]" in February that "the [c]ustomer would not be allowed to come back in the bank and . . . should be told it was inappropriate to send flowers," Umpqua did not take steps to implement that decision, such as actually *informing* the customer not to return to the bank or closing his account.[11]  Nor did Umpqua take any other action to end the harassment, such as creating a safety plan for Christian, securing a no-trespassing order, or discussing the situation with bank security or Human Resources.  Inaction is not a remedy "reasonably calculated to end the harassment," and "[w]e refuse to make liability for ratification of past harassment turn on the fortuity of whether the harasser . . . voluntarily elects to cease his activities[.]"  *Id.* at 1529.

Umpqua counters that Christian volunteered to call the customer and that *her* action was sufficient to excuse Umpqua of *its* liability.  As an initial matter, whether Christian genuinely "volunteered" to call the customer or, as Christian testified, was pressured to talk to the customer because Sanseri was uninterested in "deal[ing] with it" himself is disputed;[12] because Christian is the non-movant,

---

[11] Indeed, Sanseri himself stated that he did not take the minimal action Umpqua purports he did:  He testified that he did not tell Christian he would ensure the customer did not return to the bank.

[12] Umpqua disputes that Sanseri asked Christian to call the customer and contends that the parties' Joint Statement of Facts places this issue beyond dispute.  We disagree.  The Joint Statement of Facts states, "After receiving the flowers on Valentine's Day, plaintiff had a discussion with her manager, Chris Sanseri.  Mr. Sanseri offered to talk to the [c]ustomer and to tell him that the flowers were inappropriate and that plaintiff was not interested.  Plaintiff told Mr. Sanseri that she would call the [c]ustomer."  By contrast, Christian testified in her deposition that Sanseri "asked me if—well, he told me that it was best that I—that he probably hear from me and that I call him and asked me if I felt

the evidence must be viewed in the light most favorable to her.  Even were we to credit Umpqua's version of events, however, we refuse to accept the notion that a victim's own actions immunize her employer from liability for ongoing harassment.**[13]**  *See Nichols*, 256 F.3d at 876 ("[B]y conditioning its response on [Plaintiff's] reports of further harassment, [Defendant] placed virtually all of its remedial burden on the victimized employee . . . . [T]his response was not sufficient.").

More importantly, Umpqua's "action" easily could be deemed ineffective, since the customer did not "elect[] to cease his activities[.]"  *Fuller*, 47 F.3d at 1529; *see also Nichols*, 256 F.3d at 876 (holding employer liable where its "solution" failed "to deter future harassment").  Just a few days after the phone call, the customer hand-delivered a second letter to Christian's place of work.  Again, Umpqua took no action.  The harassment continued over the course

---

comfortable calling him and explaining to him that it was inappropriate. And I said that I'd call him, you know, because it didn't seem like he wanted to deal with it."  The Joint Statement of Facts does not necessarily conflict with Christian's deposition testimony:  Sanseri could have "offered" to talk to the customer *and also* asked or pressured Christian to call the customer.  At this stage, we take the evidence in the light most favorable to Christian and leave this factual dispute to the jury.

**[13]** In its amicus brief, the EEOC argues, compellingly, that this "action" was inappropriate given that Christian was the victim of stalking and further contact with the customer could have caused him to *escalate* his behavior.  *See* Br. of Amicus Curiae Equal Emp. Opportunity Comm'n, at 19 ("Such contact was particularly problematic here because, to individuals engaged in stalking activity, '[a]ny kind of response on the part of the victim, no matter how negative, can be construed as a sign that she is really interested.'") (quoting Jane E. Brody, *Personal Health; Do's and Don'ts for Thwarting Stalker*, N.Y. Times, Aug. 25, 1998)).

of the following seven months as the customer harassed Christian's co-workers about how to get a date with her, stalked her at the charity event she staffed, and ultimately reappeared at her workplace in September 2014.

Whether Umpqua's actions in September were sufficient is also a question for the jury. Although Umpqua eventually did close the customer's account, direct him not to return to the bank, and transfer Christian to a new branch location, a trier of fact reasonably could find that Umpqua's glacial response—more than half a year after the stalking began—was too little too late. *See Fuller*, 47 F.3d at 1528 (noting that remedy must be prompt); *Freitag*, 468 F.3d at 540 (same).

Further, a jury could find Umpqua's response unreasonable because it placed the bulk of the burden on Christian herself. *See Intlekofer v. Turnage*, 973 F.2d 773, 780 n.9 (9th Cir. 1992) ("[H]arassment is to be remedied through actions targeted at the *harasser*, not at the victim."). For instance, Umpqua managers repeatedly suggested that Christian "hide in the break room during the times when [the customer] would come into the Bank." A jury could find the suggestion that a female employee should be made to hide in her own workplace unreasonable, callous, and demeaning.

Likewise, a factfinder could determine that the transfers, first to the Evergreen Square branch and then to the Salmon Creek branch, also unreasonably burdened Christian. *See, e.g., id.* ("While the [defendant] apparently was trying to solve the situation, it did so at the expense of disrupting [Plaintiff's] life. This is not the price that victims must pay for reporting sexual harassment at the workplace."). In *Ellison*, we rejected the defendant's argument that its grant of the plaintiff's request for a temporary transfer absolved it of liability for the hostile environment: "[A] victim of sexual

harassment should not have to work in a less desirable location as a result of an employer's remedy for sexual harassment." 924 F.2d at 882. We see no reason the same defense, advanced by Umpqua here, would fare any better.

Moreover, the transfers could be construed as evidence of just how ineffective Umpqua's response was. That is, a juror could find that Umpqua failed so completely in its obligation "to stop harassment by the person who engaged in harassment," *id.*, that Christian felt she had no choice but to transfer to another bank, accepting less pay and diminished responsibilities just to escape the stalking. A forced transfer is no remedy.

In sum, there is more than enough evidence to create a genuine issue of material fact as to the sufficiency of Umpqua's response. Because a jury reasonably could conclude that Umpqua ratified or acquiesced in the customer's harassment, we hold that the district court erred in granting summary judgment in favor of Umpqua.

## IV.

"The purpose of Title VII is . . . through law to liberate the workplace from the demeaning influence of discrimination, and thereby to implement the goals of human dignity and economic equality in employment." *King v. Hillen*, 21 F.3d 1572, 1582 (Fed. Cir. 1994). Because gender-based harassment threatens the ability of its victims to thrive in the workplace, employers must act promptly to remedy its effects and prevent its recurrence. Genuine issues of material fact exist as to whether Umpqua met this mandate and, accordingly, we reverse the district court's grant of

summary judgment and remand for further proceedings consistent with his opinion.

**REVERSED and REMANDED.**