IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

AUDRA WILSON,

                Appellant,

        v.

ARCHDIOCESEN HOUSING
AUTHORITY, SHARONDA
DUNCAN, JANE DOE DUNCAN,

                Respondents.

No. 84372-9-I

DIVISION ONE

UNPUBLISHED OPINION

DíAZ, J. — Appellant Audra Wilson alleges that her former supervisor, Sharonda Duncan, grabbed her buttock and, after Wilson rebuffed her, was subsequently hostile and threatening, causing Wilson to resign. Wilson brought claims of (1) hostile work environment and (2) retaliation against Duncan and her former employer, the Archdiocesan Housing Authority (AHA), under the Washington Law Against Discrimination (WLAD). Wilson now appeals the trial court's order granting summary judgment for respondents and dismissing all of Wilson's claims. We conclude that the trial court erred in granting summary judgment because, when viewed in the light most favorable to Wilson, genuine issues of material fact remain. A jury should decide whether the combination of unsolicited sexual commentary, unwanted touching of a sexual body part, and later

changes to Wilson's work environment, after she told her supervisor not to touch her, could constitute valid claims for a hostile work environment and retaliation. Thus, we reverse and remand for further proceedings.

## FACTS

The following recitation of the factual allegations is based on the record before us, which includes Wilson's statements at her deposition, declarations, and other exhibits in support of or in opposition to AHA's motion for summary judgment.

## A.    Events of 2018 to 2019

Wilson and Duncan became friends in or around 2012 when they both worked at a local social service agency. At times, Duncan would make sexual remarks toward Wilson, which Wilson alternatively described as either "normal things that women do," such as "[y]ou're pretty," or Duncan "hit[ting] on [her]" and describing "sexual acts she will want to do to [her]" ("here and there").[1]

As to the latter, at her deposition, Wilson testified that Duncan would describe various sexual acts, which from the context of her statements broadly, she appeared to refer to what, in her understanding, lesbians would do. Wilson described these topics as something Duncan would "always talk about" between 2011 and 2013. During her deposition, Wilson said she was "real uncomfortable" discussing such acts. Again, Wilson distinguished between, on the one hand, e.g.,

---

[1] At oral argument, counsel for AHA acknowledged that there was no evidence in the record that Wilson initiated or solicited the latter types of comments. Wilson v. Archdiocesan Housing Authority et ano, No. 84372-9-I (April 18, 2023), at 16 min., 58 sec., through 17 min., 51 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023041253/?eventID=2023041253.

back rubs "if your back is hurting" or comments made if "I'm feeling upset or something" and, on the other hand, Duncan's comments about touching her breasts. In an exchange with opposing counsel, Duncan testified, "[t]he breast part is totally different."

Wilson added that this type of dialogue began "getting weird to [her]" when Duncan referred to specific sexual acts. Wilson found the comments "weird" enough she asked her sister and best friend for advice. Specifically, Wilson asked her sister for advice about how to handle when "Sharonda . . . coming onto me . . . I was kind of like wonder what that means and what that looks like."

In terms of how she responded to Duncan's comments, Wilson advised Duncan she was "strictly dicky," which Wilson purportedly used to convey her heterosexuality, and Duncan knew that Wilson was "not gay." But generally Wilson would "laugh it off and say ew that's nasty." She explained that, because they were friends, she did not take it seriously and was not offended.

About five years later, in 2018, Duncan recruited Wilson to work with her at AHA. When Wilson began working at AHA in December 2018, Duncan and she remained social friends, getting lunch during the workday and calling each other after work. Wilson was employed as a case manager for AHA, in its Bakhita Gardens residence, from December 6, 2018, to July 17, 2019. Duncan supervised case managers and, at this stage of the litigation, we accept she was Wilson's supervisor.[2]

_____

[2] The parties discuss another incident in their briefing, although the incident does not appear to be part of the underlying claims or defenses. For this reason, we note it for further context, but do not rely on it for our analysis below. Namely,

In or around June 2019, Wilson requested Duncan's assistance using a "bed bug machine" in the laundry room. When Wilson bent down to pick up a sheet, Duncan "grabbed" her buttock with one hand, which Wilson described as occurring in a "fresh way like a 'woo' type of deal." Wilson immediately grabbed Duncan's hand, held it "real tight," and told her "don't ever touch me like that." Duncan apologized, and Wilson ran out of the laundry room. Wilson testified that, while Duncan may have hugged her or patted her on the back previously, Duncan had never touched her with aggressiveness before, and it "startled" and "scared" her. Duncan denies any encounter or touching occurred in the laundry room.

Shortly after the laundry room incident, Duncan offered Wilson a ride home from work. During the car ride, Duncan told Wilson about a time when she used to work with a "girlfriend" who "became aggressive" and Duncan "got her fired." Possibly in the same car ride, Duncan also mentioned that she "gets her cousin to beat people's ass" for her. Wilson inferred that Duncan told her these stories to warn her she would face retaliation if she reported the laundry room incident.

Soon after, Wilson went on vacation and, when she returned, learned that Duncan had recently hired someone Duncan described as her cousin on Facebook. Wilson believes her relationship with Duncan changed further after that hiring, testifying in her deposition that the situation "was really weird after I came

---

sometime in spring 2019, Duncan asked Wilson to "write up" another employee for something Wilson "didn't see." Wilson refused. After that, Wilson testified that Duncan became cooler and more distant, but not hostile. While Wilson "didn't like how [Duncan's] demeanor changed after [Wilson] wouldn't write a statement against [that employee]," they discussed it and Duncan said they were "still cool."

back from my vacation." Wilson believed Duncan hired this cousin to take Duncan's position, so that Duncan could be promoted.

From that point forward, in the period between the laundry room incident and when Wilson left AHA, she described escalating mistreatment by Duncan. Wilson described "little stuff where other people wouldn't catch it," that Duncan did to Wilson, such as how she treated her in meetings. According to Wilson, other coworkers described observing the changed dynamic and encouraged Wilson to report or document her interactions with Duncan. Wilson knew how the treatment made her feel, but thought Duncan was just "having a bad day."

During this time, Wilson could not receive the supervisory support she needed from Duncan, including being unable to meet with Duncan. Wilson further was denied authorization to attend trainings on client management and administration. Wilson instead sought help from other coworkers during this time to show her "how to do random stuff."

On or about July 3, in a final "blow-up" meeting with multiple staff members present, Wilson discussed a client with a challenging issue about whom she was concerned. Wilson then suggested a possible approach to the issue. In the meeting, Wilson testified that Duncan "attack[ed]" her, saying Wilson did not "know her job," did not "know what she was talking about," and was "really trying to tear [Wilson] down." Wilson left the meeting in tears, at the time saying she felt belittled and triggered, and that she may "just put in [her] resignation." Wilson acknowledged that she said she would resign. She described that decision as a "fight or flight" situation.

Shortly after, Crystal Perine called Wilson back into the meeting, where Duncan and Duncan's cousin were present. Perine told Wilson that, if she wanted to quit, she would accept Wilson's resignation. Wilson responded that she was not going to resign, that she would continue to work her job, and that she revoked her resignation. Wilson testified that her supervisors "tried to run" with her resignation and, stood around her in a corner, and told her she was going to resign.

On July 16, 2019, Wilson emailed a supervisory staff member at AHA advising AHA she wished to continue in her position. Wilson explained that, when she initially indicated she would resign, she did so "under distress" because "Sharonda Duncan made [Wilson's] working environment intolerable" due to Duncan creating an "intimidating, offensive, and hostile work environment."

In a letter subsequently mailed to Wilson on October 4, 2019, AHA stated that it accepted Wilson's verbal resignation offered on July 10, and her last day of employment with AHA was July 18, 2019.

Just after leaving AHA, Wilson attended counseling and received medication for around one year "as a result of" her termination.

B. **Motion for Summary Judgment**

On August 5, 2020, Wilson sued Duncan and AHA in King County Superior Court. Wilson brought three claims: gender-based discrimination,[3] hostile work environment, and retaliation under WLAD.

---

[3] As confirmed at oral argument, Wilson does not appeal the standalone claim of gender-based discrimination and, as such, we will not disturb that ruling. Wash. Ct. of Appeals oral argument, supra at 4 min., 24 sec. through 5 min., 3 sec.

AHA moved for summary judgment on July 1, 2022. On August 9, 2022, the trial court granted summary judgment to AHA. In its order, the trial court held that Wilson did not present a prima facie case of a hostile work environment because (a) Plaintiff did "not testify" that the sexualized banter was unwelcome and (b) the one incident of groping was not "sufficiently pervasive" to create an abusive work environment. The trial court, citing Estevez v. Faculty Club of Univ. of Wash., also held that Wilson's retaliation claim failed because, even assuming an adverse employment action was taken, Wilson did "not present[] evidence that would allow a reasonable jury to find 'a causal link between [Plaintiff's] [protected] activity and [Defendants'] adverse action.'" 129 Wn. App 774, 797, 120 P.3d 579 (2005)).

Wilson appeals and seeks attorney fees and costs.

**ANALYSIS**

Our review of the trial court's order granting summary judgment is de novo, and we engage in the same inquiry as the trial court. Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). The inquiry on summary judgment generally, as in WLAD claims specifically, is whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. Id.; CR 59. "'A material fact is one upon which the outcome of the litigation depends.'" Walter Dorwin Teague Assocs., Inc. v. Dep't of Revenue, 20 Wn. App. 2d 519, 524, 500 P.3d 190 (2021) (quoting Wash. Fed. v. Azure Chelan, LLC, 195 Wn. App. 644, 652, 382 P.3d 20 (2016)). "We consider the evidence

and the reasonable inferences therefrom in a light most favorable to the nonmoving party." Marquis, 130 Wn.2d at 105.

"Sex discrimination in employment is prohibited by this state's law against discrimination. RCW 49.60 declares the right to be free from discrimination on the basis of race, creed, color, national origin, sex, marital status, age or disability to be a civil right." DeWater v. State, 130 Wn.2d 128, 134, 921 P.2d 1059 (1996) (citing RCW 49.60.010; RCW 49.60.030(1)).

WLAD is to be "construed liberally to effectuate its purpose of remedying discrimination." Gibson v. Costco Wholesale, Inc., 17 Wn. App. 2d 543, 556, 488 P.3d 869 (2021). This is so because "'a plaintiff bringing a discrimination case in Washington assumes the role of a private attorney general, vindicating a policy of the highest priority.'" Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171, 189 Wn.2d 607, 613, 404 P.3d 504 (2017) (quoting Marquis, 130 Wn.2d at 109).

Tying these general principles together, summary judgment is "often inappropriate" in "discrimination cases" because "WLAD 'mandates liberal construction.'" Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 777, 249 P.3d 1044 (2011) (quoting Martini v. Boeing Co., 137 Wn.2d 357, 364, 971 P.2d 45 (1999) (citing RCW 49.60.020); see also Gamble v. City of Seattle, 6 Wn. App. 2d 883, 887-88, 431 P.3d 1091 (2018) (describing resolution at summary judgment as "typically inappropriate"). In other words, summary judgment is "often inappropriate" because the evidence "will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d

807 (2007). Summary judgment in WLAD claims is reserved for those times "when the plaintiff fails to raise a genuine issue of fact on one or more prima facie elements." Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 27, 244 P.3d 438 (2010).

Because WLAD is modeled on the federal Title VII of the federal Civil Rights Act, federal cases interpreting Title VII are persuasive authority. Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 849, 292 P.3d 779 (2013).

## A.      **Hostile Work Environment**

We conclude the trial court erred in granting summary judgment to AHA on Wilson's hostile work environment claim.

### 1. Law

Sexual harassment is a form of sex discrimination. Floeting v. Grp. Health Coop., 192 Wn.2d 848, 853, 434 P.3d 39 (2019). Sexual harassment claims are generally categorized as "quid pro quo harassment" claims or "hostile work environment" claims. DeWater, 130 Wn.2d at 134 (quoting Payne v. Children's Home Society, 77 Wn. App. 507, 511, n. 2, 892 P.2d 1102 (1995)).

To establish a prima facie claim of a hostile work environment, the employee must prove (1) she was subject to harassment which was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms or conditions of employment, and (4) the harassment is imputed to the employer. DeWater, 130 Wn.2d at 135 (citing Glasgow v. Georgia-Pac. Corp., 103 Wn.2d 401, 406-407, 693 P.2d 708 (1985)); see also Little v. Windermere Relocation,

Inc., 301 F.3d 958, 966 (9th Cir. 2002).

"To determine whether the harassment is such that it affects the conditions of employment, we consider: the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Washington v. Boeing Co., 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). This element is determined with regard to the totality of the circumstances." Antonius v. King County, 153 Wn.2d 256, 261, 103 P.3d 729 (2004) (citing Glasgow v. Ga–Pac. Corp., 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)).

"'[W]hether the plaintiff has established that she or he was subjected to a hostile work environment, and whether the employer is liable for the harassment that caused the environment' presents 'mixed questions of law and fact that we review de novo.'" Christian v. Umpqua Bank, 984 F.3d 801, 808 (9th Cir. 2020) (citing Little, 301 F.3d at 966). Viewing the evidence in the light most favorable to the nonmoving party, "we must determine whether there are any genuine issues of material fact and whether the [trial court] correctly applied the relevant substantive law." Id. (citing Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1033 (9th Cir. 2005)). Courts should "not weigh the evidence or determine whether the employee's allegations are true." Davis v. Team Electric Co., 520 F.3d 1080, 1088 (9th Circ. 2008).

We review each element in turn.

2. Discussion

a. Whether the harassment was unwelcomed

"[T]o constitute harassment, the complained of conduct must be unwelcome in the sense that the plaintiff-employee did not solicit or incite it, and in the further sense that the employee regarded the conduct as undesirable or offensive." Glasgow, 103 Wn.2d at 406.

At issue is whether a reasonable jury might find that Duncan's alleged groping of Wilson's buttock in the laundry room was unwelcome. As Wilson testified at her deposition, as soon as Duncan did so, Wilson grabbed her hand and said "don't ever touch me like that again." Wilson described that such contact had never previously occurred between them, and the interaction made her feel scared and upset. Such testimony, even though Duncan denies the contact occurred, is enough to create an issue of material fact that the groping was "undesirable or offensive." Id.

Respondents argue in response that Wilson "participated in the playful relationship and thus now cannot contend that this single incident was offensive . . . as [Wilson] herself participated and solicited this kind of relationship." There is a yawning gap in respondents' argument. Respondents cite to no case law holding that sexualized banter between parties (what respondents characterize the dialogue) -- even if at first "playful" or welcomed -- establishes as a matter of law that the plaintiff thereby consented to or welcomed a later physical touching. When a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020). We strongly decline to make such case law. And again, because

Wilson expressly testified to objecting to the behavior, there is a question of fact as to whether the contact was unwelcome, even if arguendo, the prior sexualized so-called banter was "consensual," as respondents argue.

There is, however, a question of material fact whether Wilson consented to all the prior sexualized comments in the first place. While Wilson had testified to having laughed off and not being offended by some comments, she distinguished those comments and explained that other comments were "weird" and that she was uncomfortable even repeating them at her deposition. Furthermore, as counsel for Duncan acknowledged at oral argument, nothing in the record suggests that Wilson initiated or solicited *those* latter types of comments, contrary to respondents' characterization in its briefing. Wilson v. Archdiocesan Housing Authority et ano, No. 84372-9-I (April 18, 2023), at 16 min., 58 sec., through 17 min., 48 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023041253/?eventID=2023041253. When viewed in the light most favorable to Wilson, those latter types of comment then were unwelcomed because they were unsolicited, unincited and offensive. Glasgow, 103 Wn.2d at 406.

Finally, on this point, the time between when most of the sexualized comments occurred (2013) and the groping occurred (2019) cuts in two ways, when viewed in the light most favorable to Wilson, neither favorable to respondents. Either the time period does not suggest that Wilson would have provided consent in 2013 for actions in 2019, and as such, is legally irrelevant. Or, the "weird" and "uncomfortable" comments continued into her employment at AHA,

which means it constitutes an independent type of unwelcome conduct. Id. at 406-07 (examining both verbal and physical conduct as undesirable or offensive).

Ultimately, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). To the extent that it weighed the evidence, ignored certain statements Wilson made, and drew inferences in favor of AHA, the trial court erred because such determinations are for a jury.

Therefore, Wilson has adduced sufficient factual support to make a prima facie case that the groping in the laundry room was unwelcome, whether that action stands alone or represented an escalation of a pattern of unwanted verbal conduct.

b. Whether the harassment was because of sex

The second element of a prima facie case of hostile work environment, "harassment because of sex," can be established through the unwanted touching of a sexual body part. Case law interpreting Title VII, which is persuasive, holds that such conduct is prohibited regardless of whether the perpetrator and the victim are of the same or different genders. Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1068 (9th Cir. 2002) (citing Oncale v. Sundowner Offshore Svcs., 523 U.S. 75, 79, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). Furthermore, a plaintiff-employee's (perceived or actual) sexual orientation neither provides nor precludes a cause of action for sexual harassment. Id. at 1068.

Stated otherwise, unwanted physical touching targeting body parts "linked"

13

to the victim's sexuality "is inescapably 'because of ... sex.'" Id. at 1066 (quoting Doe v. City of Belleville, 119 F.3d 563, 580 (7th Cir.1997)). And, the touching of the buttocks in particular can constitute sex-based harassment. Id. (citing as patting buttocks cases Schmedding v. Tnemec Co., Inc., 187 F.3d 862, 865 (8th Cir. 1999) and Jones v. Wesco Investments, Inc., 846 F.2d 1154, 1155 (8th Cir. 1988)). Contrary to respondents' unsupported suggestion, a plaintiff need not allege that a sexual organ was touched.

In Rene, although presenting a different fact pattern, at issue was a male employee facing harassment by other male employees due to his sexual orientation. Id. at 1063. The Ninth Circuit reversed the district court's holding for the defendant employer because the district court erred in finding no sex-based harassment occurred because Rene was harassed by other men for being a gay man. Id. at 1066. The Ninth Circuit held:

> "The [Supreme] Court's holding that offensive sexual touching in a same-sex workforce is actionable discrimination under Title VII necessarily means that discrimination can take place between members of the same sex, not merely between members of the opposite sex. Thus, [the plaintiff in Oncale] did not need to show that he was treated worse than members of the opposite sex. It was enough to show that he suffered discrimination in comparison to other men."

Id. at 1067 (citing Oncale, 523 U.S. at 79).

Here, Wilson need not allege or establish Duncan's romantic or sexual interest in Wilson, but need only adduce facts that may convince a jury that Duncan groped a sexual body part to establish the harassment was "because of sex." Rene, 305 F.3d 1068. She did so testify here. There is also nothing in the record that suggests that Duncan did the same to, or otherwise treat Wilson the same as,

14

other women. Finally, contrary to respondents' argument, there is no sweeping "close friend" exception, or some de minimis exception, when it comes to the unwelcome touching of a sexualized body parts, such as the buttocks. We again decline to create one here.

"Therefore, a jury armed with '[c]ommon sense, and an appropriate sensitivity to social context' could reasonably conclude" the actions alleged here could be because of sex. Fuller, 865 F.3d at 1168 (9th Cir. 2017) (citing Oncale, 523 U.S. at 82). As the court summed up in Fuller, "[i]t is up to a jury, not us, to decide whether that plausible inference is the best one to draw from this record." Id.

### c. Whether the harassment affected the terms of employment

Our next inquiry is whether there is a genuine issue of material fact as to whether the groping (along with any prior or subsequent actions) affected the terms and conditions of Wilson's employment.

As a starting point, in determining whether there is a genuine issue of material fact, we need not look only at the unwanted verbal comments and the groping, but also the entire environment, or overall "ambience" of the workplace behavior, in which Duncan operated.

For example, in Christian v. Umpqua Bank, Christian filed a Title VII claim against her employer after she alleged the employer did not deter a bank customer from continuing to stalk her at work and send her letters after she declined his advances. Christian, 984 F.3d at 806-07. After requesting the customer be barred from the bank multiple times and being rebuffed by a supervisor, Christian

15

transferred to another branch and eventually quit after advice from a medical professional for managing her severe anxiety from the experience. Id. at 808.

The Ninth Circuit concluded the district court erred in isolating the stalking Christian experienced (that occurred in two distinct time periods) and in finding that, when so isolated, that the separate instances did not constitute severe and pervasive harassment. Id. at 809-10. The Ninth Circuit explained, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." Id. (citing Oncale, 523 U.S. at 81-82). Moreover, the court explained, "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." Id. at 810 (citing Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir. 1998)). Finally, the court held, "[w]e cannot say that a juror would not find that fear reasonable or the resulting environment hostile. The district court's overly narrow approach—which ignored the reality 'that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations'—was error." Id. (quoting Draper, 147 F.3d at 1108 n.1 (9th Cir. 1998)).

Here, like in Christian, we review the overall "ambience" of the workplace that Duncan created, in the light most favorable to Wilson. In that light, Wilson described not only a single incident of being groped in the laundry room, but (a), before that, "weird" unsolicited, sexualized comments that she was uncomfortable detailing at her deposition, and (b), after that, (i) thinly veiled threats of retaliatory

16

actions (as was done against another girlfriend), or even physical intimidation, Duncan may take against Wilson; (ii) escalating mistreatment by Duncan, including failures to communicate, to provide supervisory support and to authorize trainings; (iii) all of which led to the final "blow up" meeting, where Duncan "attack[ed]" her, causing Wilson to resign. Wilson testified that each was temporally and causally related to her declining Duncan's propositions.

Respondents counter that Wilson "engaged in a sexually playful relationship with Duncan for years, where she solicited, incited, and participated in the 'girly' behavior," and, as such, the single incident of groping "simply does not rise to the level of severity required for a reasonable person to find in her favor." Respondents flatly state that Wilson's "allegations are not so severe and pervasive as to affect the terms and conditions of employment." This is an assumption and an "overly narrow approach," which at this stage in the proceedings, we cannot make. Christian, 984 F.3d at 810.

Instead, when viewed in its totality and the light most favorable to Wilson, there is a question of fact for whether Wilson experienced severe and pervasive harassment – again beginning with the sexualized commentary, continuing through the groping, and ending with her forced termination – *because* she rebuffed the advances.

Moreover, even if we were to take a narrower view of the record, "a single 'incident' of harassment . . . can support a claim of hostile work environment because the 'frequency of the discriminatory conduct' is only one factor in the analysis." Little, 301 F.3d at 967. Furthermore, the duration of unwanted touching

17

or other harassment is also not dispositive. "It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." Carrero v. New York City Hous. Auth., 890 F.2d 569, 578 (2d Cir. 1989) (superseded by statute on other grounds as stated in Olszewski, v. Bloomberg L.P., No. 96-3393, 1999 WL 182596 (S.D.N.Y. 1999)).

Thus, respondents' argument that, "[w]hen the relationship escalated to a place in which she no longer wanted to partake in it, the conduct stopped," is unavailing. If a reasonable jury could find the one incident of groping severe enough to alter Wilson's work environment, then this element has been met. This is particularly true, given that Duncan was Wilson's supervisor. Dominguez-Curry, 424 F.3d at 1039 (finding that courts "have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer").[4]

Furthermore, if there is a genuine factual dispute about the frequency or severity of conduct, that creates a genuine issue of material fact, when viewed in the light most favorable to the plaintiff. Dominguez-Curry, 424 F.3d at 1035. In that case, the district court erred in granting summary judgment to the defendant

---

[4] At oral argument, counsel for the respondents contested that Duncan was actually Wilson's supervisor. Wash. Ct. of Appeals oral argument, supra, at 13 min., 2 sec., through 15 min., 22 sec. This was the first time AHA contested such a fact and, as such, we will not consider such a dilatory argument. RAP 12.1(a). We note also that the only evidence in the record suggests Duncan was Wilson's supervisor and that AHA itself referred to Duncan as Wilson's supervisor on the first page of their brief. At a minimum, it is an issue of fact for the jury to resolve.

employer because the district court disregarded testimony from the plaintiff describing graphic, sexually explicit jokes as "everyday jokes." Id. at 1035. The Ninth Circuit held that dismissal of such allegations and determining the plaintiff's credibility were the province of the factfinder at trial, not a district court on summary judgment. Id. at 1035-36.

Likewise, as in this case, "[w]hen severity is questionable, 'it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment.'" Fried v. Wynn Las Vegas, LLC, 18 F.4th 643, 648 (9th Cir. 2021) (quoting Davis, 520 F.3d at 1096). Thus, the trial court erred on this ground.

Finally, Respondents do not contest the fourth element, whether Duncan's harassment may imputed to AHA. For these reasons, we conclude the trial court erred in granting summary judgment to AHA on Wilson's hostile work environment claim.

## B.    Retaliation

We conclude that Wilson made a prima facie claim of retaliation under WLAD sufficient to preclude summary judgment.

### 1. Law

The WLAD protects employees engaged in statutorily protected activity from retaliation by their employer. RCW 49.60.210; Lodis, 172 Wn. App. at 847. Specifically, "[i]t is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by [the WLAD]." RCW 49.60.210(1). A claim of retaliation

under WLAD thus requires establishing three elements: (1) the employee engaged in a statutorily protected activity, (2) the employer took some adverse employment action against the employee, and (3) there is a causal link between the protected activity and the adverse action. Lodis, 172 Wn. App. at 846. We discuss each in turn.

### 2. Discussion

#### a. Protected activity

Again, an employee engages in a statutorily protected activity under WLAD when they oppose "any practices forbidden by" the act. Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014) (quoting Coville v. Cobarc Servs., Inc., 73 Wn. App. 433, 440, 869 P.2d 1103 (1994)). To show that they are engaged in a statutorily protected activity, a plaintiff "need only prove that [their opposition] went to conduct that was at least arguably a violation of the law, not that [their] opposition activity was to behavior that would actually violate the law against discrimination." Estevez, 129 Wn. App. at 798 (quoting Kahn v. Salerno, 90 Wn. App. 110, 130, 951 P.2d 321 (1998)).

When viewed in the light most favorable to Wilson, Duncan's groping of Wilson's buttock in the laundry room "at least arguably" violated WLAD. Estevez, 129 Wn. App. at 798. In turn, the protected activity that Wilson engaged in was telling Duncan after that incident never to touch her again. That allegedly forceful statement was her "opposition" to the forbidden act. Currier, 182 Wn. App. at 742; see also Lodis, 172 Wn. App. at 848 (holding that the "term 'oppose,' undefined in the statute, carries is ordinary meaning: 'to confront with hard or searching

20

questions or objections' and 'to offer resistance to, contend against, or forcefully withstand.'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1583 (2002).

Respondents argue that, while complaints about discriminatory conduct are statutorily protected activities, Wilson "never complained" at staff meetings, investigatory meetings, or by email. By this, it appears respondents mean that Wilson needed to file a formal complaint or advise persons other than her direct supervisor (Duncan) about Duncan's actions. Respondents provide no case law in support of this position. Loos, 14 Wn. App. 2d at 758 (holding that when a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none).

More substantively, as this court explained a decade ago, "the United States Supreme Court recently interpreted the opposition clause in Title VII very broadly." Lodis 172 Wn. App. at 850 (citing Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn., 555 U.S. 271, 276, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)). As the Court described in Crawford, "[t]he employer argued the opposition clause did not cover Crawford, because she had not instigated or initiated a complaint. The Court rejected this theory." Id. at 851 (citing Crawford, 555 U.S. at 276).

We conclude that the Respondents' suggested reading of "opposition" is too constrained and goes against the legislature's directive "that the provisions of the WLAD 'shall be construed liberally for the accomplishment of the purposes thereof.'" Currier, 182 Wn. App. at 741-42 (citing RCW 49.60.020). This liberal understanding of the term "oppose" is particularly true here where the person to

21

whom Wilson lodged her objection was indeed her direct supervisor, whom Wilson asked to stop an action that at least arguably violated WLAD. Wilson thereby also placed AHA on notice of her opposition, i.e., the protected activity.

We hold that, when viewing the evidence in the light most favorable to Wilson, there is sufficient evidence in the record for this first element of a claim of retaliation.

####     b.  Adverse action

"Adverse employment action means a tangible change in employment status, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Crownover v. State ex rel. Dep't of Transp., 165 Wn. App. 131, 148, 265 P.3d 971, 980 (2011) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). "If shown, constructive discharge is an adverse employment action." Jordan v. Clark, 847 F.2d 1368, 1377 n. 10 (9th Cir. 1988).

Wilson claims the adverse action AHA took was constructive discharge. An employee is constructively discharged when (1) the employer deliberately makes an employee's working conditions intolerable; (2) thereby forcing the employee to resign; (3) a reasonable person in an employee's shoes would have felt compelled to resign; and (4) the action harmed the employee. Sneed v. Barna, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996).

"Generally, whether working conditions have risen to 'intolerable' level, [as required for constructive discharge,] is a factual question for jury." Id. at 849-50 (citing Sanchez v. City of Santa Ana, 915 F.2d 424, 431 (9th Cir. 1990)).

22

Here, as to the first element, Wilson testified that the working conditions became intolerable because, as reviewed previously, Duncan made thinly veiled threats of a both professional and physical safety nature, refused to give Wilson supervisory assistance with her day-to-day work and professional development, and made slights in front of others, leading to an all-out personal attack. Contrary to respondents' characterization, it was only by way of summary that Wilson said "it was bad." For these reasons we conclude that there is a question of fact that a jury should evaluate whether such conditions, if shown, are intolerable.

As to the second element, Wilson testified that she felt forced to resign upon the alleged treatment by Duncan in the staff meeting, to the point where she claims she said in that moment, in tears, she may as well resign. Wilson explained that, in this meeting, she felt like Duncan was "trying to trigger me, talking me down . . . talking to me like I am stupid . . . just making me look dumb in front of the whole coworkers . . . It was bad. I had to literally walk out crying." When called back into a meeting, Wilson said that she did not mean to resign, but the staff would not accept the verbal withdrawal.

Based on this testimony, again in the light most favorable to her, we conclude that there is a genuine question of material fact as to whether Wilson felt forced to resign and wrongly was not allowed to rescind her resignation. If we were to agree with respondents' argument that the working conditions could not have been "so intolerable" if Wilson asked to continue to work, we would not be taking the facts in the light most favorable to Wilson.

Respondents do not contest the third or fourth elements of constructive

23

discharge. Thus, we hold that, when viewing the evidence in the light most favorable to Wilson, there is sufficient evidence in the record for a reasonable jury to find that an adverse action occurred.

### c. Causal link

Again, the third element for a claim of retaliation is whether a jury could find a causal link between the protected activity (Wilson telling Duncan not to touch her) and subsequent adverse action (here, a constructive discharge).

"'Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose.'" Currier, 182 Wn. App. at 746-47 (quoting Estevez, 129 Wn. App. at 799). At the summary judgment stage, the plaintiff's burden is one of production, not persuasion. Cornwell, 192 Wn.2d at 412. Thus, "to avoid summary judgment on causation, the employee must show *only* that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." Id. at 412-13.

"Employees may rely on the following facts to show this: (1) the employee took a protected action, (2) *the employer had knowledge of the action*, and (3) the employee was subjected to an adverse employment action." Id. at 413 (citing Wilmot, 118 Wn.2d 46, 69, 821 P.2d 18 (1991)).

In Cornwell, Cornwell's supervisor terminated her shortly after learning of a lawsuit Cornwell filed against a prior supervisor at the same workplace. Id. at 415-416. There, our Supreme Court held that, given the proximity in time between the knowledge and termination, it was "a reasonable inference that these actions were

in retaliation for Cornwell's previous lawsuit." Id. (citing Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1197 (2003) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision.") and Wilmot, 118 Wn.2d at 69 ("'[p]roximity in time between the claim and the firing is a typical beginning point'" for proving retaliation) (alteration in quoting 1 LARSON, supra, § 6.05[5], at 6-51)).

Here, again, Wilson testified to escalating negative changes to her work at AHA *after* Duncan groped her in the laundry room and Wilson told her not to touch her again. Viewing the record in the light most favorable to Wilson, Duncan, as her supervisor, obviously would have been aware that the alleged incident and objection occurred. Then, shortly after this incident, Duncan made the thinly veiled threat that she "got someone fired," could get someone beaten up, and began (when viewed in the light most favorable to Wilson) saying things to "trigger" Wilson and demean her in front of her coworkers in meetings. The adverse employment action suffered by Wilson was the constructive discharge, reviewed above.

This alleged constructive discharge occurred shortly after, within one or two months, after Wilson opposed Duncan's advances and, thus, it was "a reasonable inference that these actions were in retaliation for" Wilson's opposition to the alleged groping. Cornwell, 192 Wn.2d at 415-416.

Therefore, Wilson "presented the necessary circumstantial evidence to show that her [opposition to Duncan's touching] was a substantial motivating factor

in her" constructive discharge. Id. at 416.

In turn, because respondents do not contest the final element of her retaliation claim,[5] a prima facie case of retaliation was made and it was error to dismiss it.[6]

## C. **Attorney Fees and Costs**

RAP 18.1 permits recovery of attorney fees and costs on review if the applicable law grants that right. RAP 18.1(a). As a result, if a party requests fees under this rule, the appellate court may grant them. Id. WLAD grants parties the right to attorney fees and costs on appeal. Frisino, 160 Wn. App. at 786. If a party is successful on appeal, the appellate court may direct on remand the trial court to award fees and the costs of the appeal, should the same party prevail in the lower court. Id.

Thus, we direct that the trial court grant Wilson an award of her fees and costs for this appeal, if and only if she ultimately prevails on her claims.

## **CONCLUSION**

---

[5] We note that Wilson alleged that she was forced to pay for counseling and medication for over a year just after the incident occurred.

[6] Normally, where a "plaintiff establishes a prima facie case [of retaliation], then the defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action. This shifts the burden back to the plaintiff to prove that the employer's reason is pretextual. The trier of fact must then 'choose between inferences when the record contains reasonable but competing inferences of both discriminatory and nondiscriminatory actions.'" Currier, 182 Wn. App. at 743 (quoting Burchfiel v. Boeing Corp., 149 Wn. App. 468, 483, 205 P.3d 145 (2009)). We need not reach whether respondents rebutted the prima facie case, as respondents' entire argument below and on appeal revolved around Wilson's alleged failure to make her prima facie case.

We reverse the dismissal of Wilson's hostile work environment claims and remand this matter to the superior court for further proceedings.

Díaz, J.

WE CONCUR: