# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHEILA LAROSE,<br><br>    Respondent,<br><br> v.<br><br>KING COUNTY, WASHINGTON,<br><br>    Appellant,<br><br>PUBLIC DEFENDER ASSOCIATION D/B/A<br>THE DEFENDER ASSOCIATION (TDA),<br><br>    Defendant below. | No. 56455-6-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, C.J. — Sheila LaRose, a former public defender who worked under the Tacoma Defense Association (TDA) and then under King County (the County), sued TDA and the County claiming hostile work environment and negligence after she was sexually harassed and physically stalked by a client during and after her representation of the client. The jury found for LaRose on the hostile work environment claim against the County. As instructed by the trial court, the jury did not address the negligence claim against the County once it found for LaRose on the hostile work environment claim. The jury also found by special verdict that (1) LaRose suffered post-traumatic stress disorder (PTSD) and/or depressive disorder, and (2) on a more probable than not basis that her PTSD and/or depressive disorder was the result of a single traumatic event.

No. 56455-6-II

The County appeals. The County challenges the trial court's denial of its summary judgment motion and CR 50 motion for judgment as a matter of law. It contends that the trial court should have dismissed the hostile work environment claim because (1) a hostile work environment claim cannot be based on the actions of a nonemployee that took place outside of the work environment after the professional relationship ended; (2) a hostile work environment claim cannot be based on the actions of a nonemployee that took place in the workplace after the professional relationship ended; and (3) the County took prompt, effective, and reasonable corrective action to address the harassment that occurred during the 26 days that LaRose was representing Smith as a County employee. The County also argues that if we reverse the verdict, remand for a new trial on the undecided negligence claim against the County is not required because the jury's special verdict establishes that the negligence claim is barred by the Industrial Insurance Act (IIA), Title 51 RCW, immunity.

We agree that the trial court should have granted the County's CR 50 motion and dismissed the hostile work environment claim against the County. We also agree that remand on the negligence claim is not required.[1]

---

[1] Accordingly, we do not reach the other issues that the County raises.

## FACTS

I.    BACKGROUND[2]

A.    Events During LaRose's Employment at TDA

Prior to July 1, 2013, TDA,[3] was a private firm providing public defense legal services for the County.

In 2009, Sheila LaRose, a former investigator for TDA, began working as a public defender for TDA. LaRose's first assignments as a public defender were to the involuntary treatment act (ITA)[4] unit and a misdemeanor unit.

In July 2012, LaRose transferred to the Seattle felony unit. Her supervisors in the felony unit were Benjamin Goldsmith and Daron Morris.

On October 31, 2012, the felony docket clerk for TDA assigned "Smith's"[5] felony stalking case to LaRose. LaRose was aware that Smith had prior convictions for stalking.

LaRose first met with Smith at his November 5 arraignment. But he left the courtroom prior to his case being called by the court, and LaRose was not in contact with him again until January 2013.

---

[2] Because we are reviewing a CR 50 motion, these facts are presented in the light most favorable to LaRose. *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021); *Verizon Nw., Inc. v. Emp. Sec. Dep't.*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008).

[3] After June 30, 2013, the County assumed responsibility for public defense services, and TDA (which later became known as The Public Defender Association) did not provide public defense services for King County after June 30, 2013. For clarity, we refer to TDA throughout when referring to the other defendant in this case.

[4] Ch. 71.05 RCW.

[5] Because the details of LaRose's representation of her client are privileged, we refer to LaRose's client as Smith.

Smith was finally arraigned on February 4, 2013. He was in custody at the time of his arraignment, and he remained in custody until his release following his stalking conviction.

LaRose attempted to negotiate a plea offer on Smith's behalf with the State. Smith was unhappy with the State's offer, and on March 25 he told LaRose that he wanted new counsel. After Smith spoke with Morris, LaRose remained on the case.

Following Morris' meeting with Smith, Smith started to call LaRose and tell her that he loved her, wanted to be with her, and wanted to marry her. According to LaRose, as discussed below, these "calls progressed and became sexually explicit calls." 8 Verbatim Rep. of Proc. (VRP) (Sept. 27, 2021 p.m.) at 715. Smith called LaRose "numerous times per day." *Id.*

Around the same time Smith's calls increased, LaRose became concerned that she would lose her job because she had been feeling overwhelmed by her work and had recently stepped down from a murder case on which she had been co-counsel with Goldsmith. In addition, immediately after stepping down from the murder case, Goldsmith and Morris had started conducting a review of her work. She was required to bring all of her files to Goldsmith's office, and he and Morris pulled three files to review her work.[6] LaRose believed that at this time Goldsmith "was becoming increasingly frustrated with [her]." *Id.* at 695.

By April 2013, Smith's calls reached a point that LaRose told Goldsmith about them. She also told Goldsmith that she was not sleeping and that she "thought [she] needed to get off" of Smith's case. *Id.* at 716-17.

---

[6] Goldsmith later testified that pulling and reviewing case files is a routine part of the evaluation process.

According to LaRose, Goldsmith responded by saying, "Okay." *Id.* at 717. But LaRose believed that he looked "angry and frustrated and disgusted with" her, and she felt that she was now certainly going to lose her job. *Id.* Several days later, because she was afraid of losing her job and Smith's case was nearly complete, LaRose told Goldsmith that she would finish Smith's case. Smith's calls continued.

On April 30, LaRose received correspondence from Smith. The first several pages of the correspondence included information about Smith's then-current stalking charge. On subsequent pages, he made more personal statements directed to LaRose about how much he loved her.

A short time later, LaRose met with Smith in jail and he gave her more correspondence. In this correspondence, Smith made "admissions" related to his charges. 17 RP (Sept. 30, 2021 a.m.) at 1366. But the final two pages of the correspondence included drawings and personal comments such as, " 'I want to be with you. I want to make family [sic] with you,' " and other statements of that nature. *Id.*

These writings concerned LaRose because in them Smith had admitted his involvement in the charged crime and because the later writings suggested that his thought processes were "more disorganized." *Id.* at 1367. This raised issues regarding Smith's mental health, and LaRose believed that he appeared to be decompensating. His personal comments to LaRose also concerned her.

On May 24, LaRose raised the issue of Smith's competency in the trial court. When LaRose informed the court that her concerns were based on his correspondence, the court told her to present the documents to the court ex parte with a motion to seal.

LaRose returned to the office and discussed her concerns about the court's directions with Goldsmith and another supervisor, Leo Hamaji. Because they viewed the first several pages of the correspondence as admissions of guilt on the stalking charge, they decided that they would not turn these pages over to the court.

Regarding the last few pages of the correspondence, "[b]oth [Goldsmith] and [Hamaji] discussed that [the correspondence] implicated [Smith] in stalking [LaRose] because of the statements made."[7] *Id.* at 1375. Accordingly, they also decided not to turn those pages over to the court. During this meeting, LaRose did not ask to be removed from Smith's case.

Smith continued to call LaRose. LaRose described these calls as personal and intrusive and sometimes of a sexual nature. LaRose told Smith to stop calling and talking to her that way, but the calls persisted.

On June 4, LaRose met with Hamaji after the content of the calls started "getting worse." *Id.* at 1378. LaRose chose to go to Hamaji because Goldsmith's responses to her concerns had made her uncomfortable, and Morris had told her that she could go to Hamaji for supervision instead of Goldsmith if she preferred.

LaRose told Hamaji about the content of the calls, that she had received 10 calls that day, and that she was "worried" about them. *Id.* at 1379. She also told Hamaji that she did not know what to do. According to LaRose, Hamaji shared a story about a similar experience he had with a female client and told LaRose to ignore the calls.

---

[7] LaRose characterized some of Smith's writings as "implicat[ing] him in stalking [her]." 17 RP (Sept. 30, 2021 a.m.) at 1402.

6

LaRose was surprised and disheartened by Hamaji's advice. She felt that Hamaji was not taking her seriously and that he did not understand the severity and impact of Smith's calls. She also felt unsupported because no one at TDA took any action to stop Smith's contacts, and she did not think that ignoring the calls was a viable solution. Additionally, she was concerned because she considered Smith's comment about wanting to have a family with her to be of a sexual nature and indicative of a fixation on her and because he did not stop calling when she told him to stop. She was particularly troubled because she knew that Smith would eventually be released from custody.

B.     Events During King County Employment

1.     During Representation of Smith from July 1 to July 26, 2013

On July 1, 2013, the County assumed responsibility for public defense services, and the TDA employees who chose to remain, including LaRose, became King County employees.

On July 18, Smith entered a guilty plea that would result in him soon being released from jail. Smith asked to withdraw the plea the next day. In light of the request to withdraw his plea, LaRose was permitted to withdraw from representation on July 26.

Between July 1 and July 26, during the 26-day period of representation under King County, LaRose went to Goldsmith "several times . . . about the calls." 17 VRP (Sept. 30, 2021 a.m.) at 1390. LaRose stated that when she told Goldsmith that she was still getting the calls during her representation of Smith and that she was worried, he did not respond and "was very dismissive." *Id.*

2.    Period Between the End of LaRose's Representation on July 26 and Smith's Actions in February, 2014

Although LaRose's representation of Smith had terminated and she had told him not to call and threatened to call the police, Smith continued to call. LaRose estimated that he called 1000 times in a six-month period.

LaRose stated that she twice told Goldsmith that Smith was continuing to call despite her withdrawal from his case and that she was concerned. Both times, according to her, Goldsmith just shrugged. She went to Goldsmith a third time and told him that the calls were continuing and " 'getting worse.' " *Id.* at 1407. This time he shrugged and said, " 'I don't know. Call the cops or the police.' "[8] *Id.* at 1407-08.

Starting in October or November, LaRose screened her calls[9] to avoid direct contact with Smith in an attempt to get him to stop calling. If she accidentally answered when Smith called, she would hang up.

On October 31, LaRose received an employee evaluation from Morris. According to LaRose, she was surprised by this evaluation because she had received her last evaluation that past June.[10]

---

[8] There is nothing in the record suggesting that LaRose or anyone else called the police about Smith's calls. LaRose did not contact the police until the physical stalking escalated in February 2014.

[9] The County had a caller announce system that would ask callers who was calling, put the caller on hold, and permit the person receiving the call to decide whether to accept the call or send it to voicemail.

[10] At the end of June 2013, after having been in the felony unit for almost a year, LaRose received an evaluation that was signed by the person who had supervised her in another unit. Although the evaluator signed the evaluation in late June 2013, the evaluation was for the period of July 2011 through December 2012.

Morris' evaluation acknowledged that reviews of LaRose's case files had occurred in March and August 2013. Morris stated that LaRose had been having " 'some difficulties in her felony practice,' " that they had met about these issues, and that in August and September they had come up with a plan to reduce her felony workload to permit her to " 'marshal her resources and tackle some of' " these issues. *Id.* at 1396. The evaluation noted that LaRose's performance had improved in these areas.

Morris noted that LaRose had attributed her issues to her heavy felony caseload, and LaRose later testified that the heavy caseload had caused similar issues with her coworkers. The evaluation also noted that there had been numerous client complaints about LaRose's lack of communication but that there had been no client complaints since the day her representation of Smith ended. The evaluation directed LaRose to more " 'proactively engag[e] with supervisors,' " recommending more regular meetings and that she seek out supervision as the need arose. *Id.* at 1403.

LaRose later testified that she felt that the October 2013 evaluation did not take into account what had happened with regard to Smith, how Smith's case had been assigned, or that she had been reporting issues with Smith and needed help. But LaRose did not state exactly how Smith's behavior had impacted her work or when.

Shortly after this evaluation, LaRose encountered Smith in a pierogi shop near her office where she regularly got coffee. Smith had been calling her all day, but when she encountered him in person she realized that he was now out of custody. She told Smith to stay away from her and immediately left the restaurant.

LaRose reported this encounter to Hamaji, and he intercepted one of Smith's calls that same day. Hamaji told Smith to stop calling. And, in an attempt to dissuade Smith from continuing to call by appealing to his apparent attraction to LaRose, Hamaji also told Smith that LaRose was no longer his attorney and that if he continued to call her she would be in trouble.

LaRose did not call the police following this run-in with Smith. Smith's calls continued, but no one checked with LaRose to see if the calls had stopped or attempted to do anything to stop Smith from being able to call her.

According to one of the County's receptionists, at some point after Smith's release he came to the County's lobby seeking to contact LaRose, but he was not admitted. There is no suggestion in the record that LaRose was aware of this visit.

Possibly as early as early November, LaRose played several of Smith's voicemails to a colleague in the public defender's office. LaRose told her colleague that "she had been getting them most of the summer." 25 VRP (Oct. 14, 2021 a.m.) at 2097-98, 2123. LaRose's colleague characterized these calls as "scary," and she later testified that the calls "were clearly from somebody who was not well" and was "obsessed" with LaRose. *Id.* at 2099. She also believed that the calls demonstrated that Smith appeared to have "knowledge . . . of [LaRose's] movements."[11] *Id.* at 2123.

In February 2014, Smith's behavior escalated.

---

[11] LaRose's colleague also testified that LaRose said that she had not reported the calls to anyone, apparently because she was concerned about being loyal to her client and maintaining client confidences. The colleague testified that she told LaRose that she had to report the calls to management. But because LaRose testified otherwise, we must consider the facts in the light most favorable to LaRose and evaluate the summary judgment and CR 50 motion assuming that LaRose's testimony about reporting the calls to Goldsmith and Hamaji was correct.

On February 16,[12] LaRose discovered that Smith had left literature about converting non-Muslim women to the Muslim faith in her home mailbox and found other evidence that Smith had been to her house. LaRose reported this to the police in person and requested a "police watch" on her house. 20 VRP (Oct. 6, 2021 a.m.) at 1650. An officer came to her house and retrieved the literature. Around that same time,[13] Smith began leaving messages on LaRose's work phone saying things that suggested to LaRose that he had been at her house.

On February 17, Smith left a voice mail referring to seeing LaRose's daughter and referencing her house. That evening, LaRose saw Smith staring at her from outside of her front gate while she was in the house, and she called 911.[14]

On February 18, LaRose sent an email to the felony unit describing the recent events and Smith's continued calling. LaRose stated in the email that she had contacted the police and would be seeking an anti-harassment order. Several of LaRose's coworkers responded to this email.

In her response to LaRose's email, another female attorney, Rebecca Lederer, told LaRose that she remembered Smith and that he was " 'the only client [she had] asked to have reassigned because he started leaving [her] love messages on [her] answering machine.' " 17 VRP (Sept. 30, 2021 a.m.) at 1414-15. According to LaRose, this was the first time she learned that Lederer had been removed from one of Smith's previous stalking cases. And LaRose was upset by this new information because she did not know this when she decided to remain on Smith's case until

---

[12] The record is vague about whether this occurred on February 16 or 17, but as a whole, the record seems to show that this occurred on February 16.

[13] The date this started is not clear from the record.

[14] The record does not reflect whether or how the police responded to this call.

completion of the case and, had she known, she would have stood by her initial decision to ask for the case to be reassigned.

Richard Lichtenstadter, a deputy director, responded that the front desk needed to be notified to watch for Smith in case he came to the office. After receiving LaRose's email, the front desk staff was told to direct Smith's calls to supervisors rather than to LaRose and was provided with a photograph of Smith.

Director Floris Mikkelsen responded that she was sorry to hear about these events and that LaRose needed to come to Mikkelsen's office to make a plan. According to LaRose, when she met with Mikkelsen, she told Mikkelsen that she had not known about any prior issues with Smith. LaRose believed Mikkelsen was angry and stated that Goldsmith should not have assigned her the case.

Mikkelsen offered LaRose a place to stay and offered to provide her with a wearable alarm. LaRose refused these offers. Mikkelsen also told LaRose that Hamaji should accompany her to court the next day and help her obtain a temporary protection order.

On February 19, Hamaji accompanied LaRose to court where she obtained a temporary protection order.

That same day, Smith left several voicemails for LaRose in which he said that he wanted to leave her a gift and to come by her house. As LaRose approached her car after leaving work that evening, she noticed a bag and a letter on the car's windshield. LaRose's car was parked in a private garage near her office.

Suspecting that the package and letter were from Smith, LaRose immediately headed back to the elevators and called 911 on her cell phone. As she headed towards the elevators, Smith

jumped out from behind a post and frightened LaRose. The elevator opened, and LaRose got on. The men who were in the elevator when she got on stayed with her until she got out of the garage.

In the early morning hours of February 20, Smith appeared at LaRose's bedroom door that led into her fenced backyard, pressed his nose to the glass, and knocked on the door. LaRose called the police and they came to her house, but they were unable to find Smith.

LaRose also called her ex-husband, and he came to stay with her. Smith then knocked on the bedroom door again, and LaRose once again called the police. LaRose then heard an "angry knock on the back door," and while she was on the phone to 911, Smith threw a rock through LaRose's bedroom window. 11 VRP (Sept. 30, 2021 p.m.) at 959. The police were unable to locate Smith. After Smith broke the bedroom window, he left a voicemail threatening to kill her ex-husband.

LaRose emailed her colleagues about what had occurred on the evening of February 19 and morning of February 20. At work a group gathered outside of her office, and LaRose heard Paul Vernon, another public defender, slap his hand on the bookshelf and say, " 'I told Ben not to assign that case to a woman.' " *Id.* at 962.

In an attempt to obtain assistance with the situation, Goldsmith and Mikkelsen reached out to the head of the criminal division at the King County Prosecutor's Office. Lichtenstadter also called the detective on the case to convey how serious the situation was after finding out that LaRose felt that the police were not acting fast enough to protect her by apprehending Smith. Hamaji also suggested to LaRose that she should "get a stick and look at some YouTube videos about stick defense" so she could defend herself in her home while waiting for the police if Smith came to her home again. 7 VRP (Sept. 22, 2021 p.m.) at 611.

13

On February 21, with assistance of several of her coworkers, LaRose lured Smith to a coffee shop near her work. When Smith arrived, LaRose's coworkers called 911, and Smith was arrested. Smith was subsequently convicted of felony stalking with sexual motivation in January 2015 and sentenced to seven years of confinement.

3.    Consequences of Smith's Stalking

After Smith's arrest, LaRose continued to work on felony cases until she was assigned to attorney of the day duties sometime after June 2014. As the attorney of the day, LaRose did not carry her own caseload and, instead, appeared in the courtroom to handle arraignments.

After Smith was convicted in January 2015, it became increasingly difficult for LaRose to care for herself and her daughter, and she sought medical assistance. LaRose was ultimately diagnosed with depressive disorder, generalized anxiety disorder, and PTSD.

Upon her PTSD diagnosis in March 2015, LaRose requested medical leave. When she returned from medical leave in May 2015, LaRose returned to the ITA unit. She remained there until December 2015, when she was again placed on medical leave.

In June 2017, LaRose was medically separated and her employment with the County was terminated because she was unable to return to work in the foreseeable future.

## II.    LAWSUIT

A.    Complaint, First Summary Judgment Motion, and First Appeal

LaRose filed a lawsuit against [T]DA and the County, alleging among other claims that her supervisors' handling of the situation with Smith had created a hostile work environment in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, that [T]DA and the County were negligent in failing to protect her from Smith's harassment, that [T]DA and the County deliberately injured her, and that the County discriminated against her based on her disability [(PTSD)]. The trial court dismissed the hostile work

14

environment claim under CR 12(b)(6) and granted summary judgment in favor of [T]DA and the County on LaRose's remaining claims.

*LaRose v. King County*, 8 Wn. App. 2d 90, 96-97, 437 P.3d 701 (2019).

LaRose appealed the CR 12(b)(6) dismissal of her hostile work environment, negligence, and disability discrimination claims. *See id.* at 102. This court decided *LaRose* on March 19, 2019.

In that appeal, "LaRose argue[d] that the trial court erred by ruling as a matter of law that [T]DA and the County could not be liable under the WLAD for the harassing behavior of a nonemployee." *Id.* at 104. We held "that under the circumstances here, [T]DA and the County may be subject to liability on a hostile work environment claim based on harassment of their employee LaRose by a nonemployee." *Id.* We defined the issue as, "whether a *nonemployee's* harassment of the plaintiff can be imputed to an employer when the employer knew of the harassment and failed to take adequate corrective action." *Id.* at 105.

We "adopt[ed] the federal rule and conclude[d] that a nonemployee's harassment of an employee in the workplace will be imputed to an employer if the employer '(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action.' " *Id.* at 111 (quoting *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985)). We therefore "reverse[d] the trial court's ruling that as a matter of law [T]DA and the County could not be liable under the WLAD for the harassing behavior of Smith." *Id.*

We also examined whether the trial court erred when it denied the County's motion for summary judgment on the issue of vicarious liability and when it ruled that as a matter of law the County was vicariously liable for TDA's conduct prior to July 2013. *Id.* at 127. We concluded that

the County was not vicariously liable for TDA's conduct prior to July 2013 because TDA was acting as an independent contractor and not as an agent. *Id.* at 130.

Additionally, we addressed whether "the trial court erred by ruling that the IIA barred her negligence claims" because LaRose's injury or disease arising in the workplace met the IIA definition of an injury or occupational disease and was potentially compensable under the IIA. *Id.* at 113. We held that on remand there were remaining questions of fact as to (1) whether a singular traumatic event could be identified as causing LaRose's injury, and (2) whether any singular traumatic event produced an immediate result. *Id.* at 118-19.

B.     Post Remand Summary Judgment Motions

After remand, the County filed a new summary judgment motion seeking to dismiss LaRose's hostile work environment and negligence claims. The trial court denied the County's motion for summary judgment.[15] The case then proceeded to trial.

C.     Trial

At trial, the witnesses testified to the facts described above.

On October 11, 2021, after the close of LaRose's case, the County filed a "half-time motion" for judgment as a matter of law under CR 50.[16] 16 VRP (Oct. 11, 2021 p.m.) at 1491. The County argued that the hostile work environment claim should be dismissed because LaRose had failed to offer substantial evidence to prove the elements of the claim as a matter of law.

---

[15] Commissioner Bearse denied the County's and TDA's motion for discretionary review of the denial of these summary judgment motions. Ruling Den. Rev., *LaRose v. King County*, No. 55241-8-II (Wash. Ct. App. Jan. 19, 2021).

[16] This motion was not argued until after all of the testimony was complete.

The County argued that there was no evidence that during the 26-day period when LaRose represented Smith as a County employee that the County could have taken any corrective action to remedy Smith's behavior because he had already "latched onto" LaRose before she became a County employee. CP at 9764. The County also argued that it was not within its power to control Smith and all it could have done was remove LaRose from the case, but LaRose told Goldsmith that she wanted to remain on the case.

Regarding the post-representation period, the County argued that it could not be liable for off-premises conduct by a nonemployee over whom the County had no control and that it had appropriately protected LaRose in the workplace. The County also argued that in LaRose's first appeal this court had specifically stated that the claims that survived were " 'in the workplace' " and that Smith's actions took place outside the workplace. *Id.* at 9768 (emphasis omitted) (quoting *LaRose*, 8 Wn. App. 2d at 109). Additionally, the County argued that it had made appropriate efforts to protect LaRose at work during this time.

The trial court denied the motion to dismiss.

D.      Verdict

The jury returned a verdict in LaRose's favor on the hostile work environment claim against the County. As instructed in the verdict form, because the jury found in LaRose's favor on the hostile work environment claim, the jury did not reach the negligence claim against the County.[17] The jury returned a verdict in favor of TDA on both the hostile work environment and negligence claims.

---

[17] LaRose's proposed verdict form contained this limitation.

Additionally, the jury found by special verdict that (1) LaRose suffered PTSD and/or depressive disorder, and (2) on a more probable than not basis that her PTSD and/or depressive disorder was the result of a single traumatic event.[18]

The jury awarded LaRose $4.8 million in non-economic damages and $2.2 million in economic damages. The jury also awarded over $4 million in attorney and paralegal fees to LaRose's counsel.

The County appeals.

## ANALYSIS

### DENIAL OF CR 50 MOTION

The County argues that the trial court erred when it denied the County's CR 50 motion[19] because, (1) regarding the post-representation period, the County cannot, as a matter of law, be liable for the actions of a nonemployee that occurred outside the workplace and after the professional relationship between the nonemployee and the employer ended; (2) there was no evidence that the County failed to take prompt action that was reasonably calculated to end Smith's post-representation, on-site harassment; (3) there was no evidence that Smith's harassment during the 26-days that LaRose represented Smith as a County employee affected the terms and conditions of LaRose's employment; and (4) the evidence did not establish that the County failed to take reasonably prompt and adequate corrective action during the time LaRose represented Smith as a

---

[18] To find that the PTSD and/or depressive disorder was the result of a single traumatic event, the jury instructions required the jury to find that the event was "sudden and produce[d] an immediate or prompt result." CP at 10291 (Instruction 27).

[19] The County also argues that the trial court erred when it denied its motion for summary judgment. But because we hold that the trial court erred when it denied the CR 50 motion, we do not address that argument.

18

County employee. The County also argues that if we reverse the verdict, remand for a decision on the negligence claim against the County is not required because the jury's special verdict establishes that the negligence claim is barred under the IIA.

To determine whether the trial court erred when it concluded that the County could be liable on the hostile work environment claim based on Smith's harassing behavior, we must address three distinct sets of events, (1) Smith's post-representation harassment that occurred away from the workplace, (2) Smith's post-representation contacts with LaRose at her workplace, and (3) Smith's actions during the 26-day period of time LaRose represented Smith while she was employed by the County.

We hold that the trial court erred when it failed to grant the County's CR 50 motion to dismiss LaRose's hostile work environment claim against the County as a matter of law and reverse the verdict and the related judgment and award of attorney fees. We need not remand for a decision on whether the IIA bars the negligence claim because that issue was resolved by the jury's special verdict.

A.      Legal Principles

When reviewing a trial court's decision on a motion for judgment as a matter of law under CR 50, we apply the same standard as the trial court. *Johnson v. Liquor & Cannabis Bd.*, 197 Wn.2d 605, 611, 486 P.3d 125 (2021). The trial court should grant a motion for judgment as a matter of law only after a party has been "fully heard on an issue and 'there is no legally sufficient evidentiary basis for a reasonable jury to find or have found' for that party on that issue." *Mancini v. City of Tacoma*, 196 Wn.2d 864, 876-77, 479 P.3d 656 (2021) (quoting CR 50(a)(1)).

Motions for judgment as a matter of law "should be granted only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party." *H.B.H. v. State*, 192 Wn.2d 154, 162, 429 P.3d 484 (2018). Substantial evidence exists when the evidence "is sufficient to persuade a fair-minded, rational person of the truth of the declared premise." *Brown v. Superior Underwriters*, 30 Wn. App. 303, 306, 632 P.2d 887 (1980).

B.      Hostile Work Environment Principles

Under RCW 49.60.180(3)[20] it is an unfair practice for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . , sex." RCW 49.60.030(2) permits a person discriminated against in violation of the WLAD to bring a civil action.

A hostile work environment is one form of sex discrimination. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004). To establish a prima facie claim of a hostile work environment the plaintiff must show that "(1) the harassment was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." *Id.* Our supreme court adopted this test in *Glasgow*, 103 Wn.2d at 406-07.

Under the fourth element of this test, an employer will be responsible for harassment by an individual who is not an owner, manager, partner or corporate officer if the employer "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt

---

[20] Although the legislature amended chapter 49.60 RCW in many respects in 2020, we cite to the current version of the statutes in chapter 49.60 RCW because the amendments did not alter the relevant portions of the statutes. LAWS OF 2020, ch. 52, §§ 4, 10.

and adequate corrective action." *Id.* at 407. Plaintiffs can establish knowledge and failure to take adequate corrective action by showing

> (a) that complaints were made to the employer through higher managerial or supervisory personnel or by proving such a pervasiveness of sexual harassment at the workplace as to create an inference of the employer's knowledge or constructive knowledge of it and (b) that the employer's remedial action was not of such nature as to have been reasonably calculated to end the harassment.

*Id.*

And in *LaRose*, we adopted federal precedent and expanded the *Glasgow* test to also include harassment by a nonemployee "if the employer '(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action.' " 8 Wn. App. 2d at 111 (quoting *Glasgow*, 103 Wn.2d at 407).

C.     County Liability for Post-Representation Harassment Away from the Work Environment

The County's core argument is that it cannot be liable on the hostile work environment claim based on Smith's post-representation harassment that occurred away from the work environment because that harassment occurred away from the office or other work-related premises after the professional (lawyer/client) relationship that Smith had with the County ended.

LaRose responds that hostile work environment claims can extend to this type of harassment if, under the totality of the circumstances, there is "a nexus" between the harassment and the work environment. Revised Br. of Resp't at 46. And she contends that the nexus here is provided because "[b]ut for" her representation of Smith, Smith's off-site, post-representation harassment would not have occurred. *Id.*

We agree with the County.

21

1.        Law of the Case Doctrine Does Not Apply

Initially, the County contends that our repeated use of the phrase " 'in the workplace' " in *LaRose* establishes that "it is the law of the case that harassment by a nonemployee is actionable only when it takes place 'in the workplace,' " not away from the work-related environment by a nonemployee who no longer has a work relationship with the employer or plaintiff. Br. of Appellant at 15 (quoting *LaRose*, 8 Wn. App. 2d at 97). We reject the County's law of the case argument.

As used here, the law of the case doctrine stands for the proposition that a legal decision of an " 'appellate court establishes the law of the case and it must be followed . . . on remand.' " *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 58, 366 P.3d 1246 (2015) (emphasis omitted) (internal quotation marks omitted) (quoting *United States v. Rivera-Martinez*, 931 F.2d 148, 150 (1st Cir. 1991)). The doctrine " 'forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case.' " *Id.* at 56 (internal quotation marks omitted) (quoting *Municipality of San Juan v. Rullan*, 318 F.3d 26, 29 (1st Cir. 2003)).

In *LaRose*, we addressed "whether a *nonemployee's* harassment of the plaintiff can be imputed to an employer." 8 Wn. App. 2d at 105. Although we used the phrase "in the workplace" throughout the decision, the legal question addressed was the effect of Smith's status as a nonemployee, not whether the fact Smith's actions occurred outside of the work environment or after his professional relationship with LaRose had ended precluded LaRose's hostile work environment claim against the County. *Id.* at 97, 110-11. Because we never explicitly or by reasonable implication addressed whether actions that occurred outside of the work environment

after the professional relationship ended could establish a hostile work environment claim, we reject the County's law of the case argument.

LaRose also argues that *LaRose* establishes the law of the case and that it "established that a non-employee's stalking of an employee can create a hostile work environment under WLAD if the employee establishes the *prima facie* elements of a claim."[21] Revised Br. of Resp't at 44. But, again, in *LaRose* we did not address whether actions that occurred outside of the work environment after the professional relationship ended could establish a hostile work environment claim, so we reject LaRose's law of the case argument.

2.       Post-Representation Harassment Occurring Outside of the Work Environment

      a.       County's Arguments

            i.       Cases Cited in *LaRose*

The County argues that the cases we relied on in *LaRose* demonstrate that employer liability based on conduct by a nonemployee is permitted only when the relevant acts occurred within the workplace or at off-site events that are the equivalent of the workplace.

This argument is not persuasive because none of the cases that the County identifies from *LaRose* required the court to consider whether an employer's liability extended to acts by third parties that did not occur either on work premises or during off-site work-related activities, so they are inapposite. *See Beckford v. Dep't of Corr.*, 605 F.3d 951, 953-56 (11th Cir. 2010) (sexual

---

[21] LaRose also suggests that this issue has already been decided because it was addressed in Commissioner Bearse's denial of King County's motion for discretionary review of the trial court's August 2020 denial of its second summary judgment motion. But "the commissioner's ruling has no binding effect on an independent review of the issues here." *Dalsing v. Pierce County*, 190 Wn. App. 251, 267 n.8, 357 P.3d 80 (2015).

harassment by prison inmates on work premises);[22] *Diaz v. AutoZoners, LLC*, 484 S.W.3d 64, 72-74 (Mo. Ct. App. 2015) (sexual harassment by customers on work premises); *Dunn v. Wash. County Hosp.*, 429 F.3d 689, 690 (7th Cir. 2005) (sexual harassment by independent contractor on work premises); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 964 (9th Cir. 2002) (sexual harassment and assault by client during and immediately following business dinner).

ii.     EEOC Regulation and Federal Cases

Recognizing that there are no Washington cases that address this issue, the County next asserts that federal Equal Employment Opportunity Commission (EEOC) regulation 29 C.F.R. § 1604.11(e), and federal case law demonstrate that the harassing acts must take place in the workplace. Although the County admits that "[o]ff-site work events, such as business meetings, or other environments akin to the workplace where the employer exerts control are effectively 'in the workplace' and can form the basis for a [hostile work environment claim,]" it contends that the total absence of control over Smith's behavior after the end of the professional relationship demonstrates that the harassment here was not "in the workplace." Br. of Appellant at 17 n.6.

29 C.F.R. § 1604.11 provides, in part,

(a) Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

---

[22] Washington courts "have frequently recognized that while federal discrimination cases are not binding, they may be persuasive and their analyses adopted where they further the purposes and mandates of state law." *Antonius*, 153 Wn.2d at 266. Our supreme court itself has examined federal cases interpreting Title VII when examining issues of first impression related to hostile work environment claims under WLAD. *See Robel v. Roundup Corp.*, 148 Wn.2d 35, 44, 59 P.3d 611 (2002).

(b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

 . . . .

(e) An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees *in the workplace*, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 C.F.R. § 1604.11 (emphasis added).

The use of the phrase "in the workplace" in subsection (e) does suggest that hostile work environment claims are limited to sexual harassment that occurs within the physical workplace or its equivalent.

The County cites *Bodman v. Maine, Department of Health and Human Services*, 787 F. Supp. 2d 89, 102-03 (D. Me. 2011).

*Bodman* involved harassment of a state employee by the employee's former boyfriend (a nonemployee) who occasionally had access to the employee's work premises as part of his job with another company. 787 F. Supp. 2d at 93-94. The only harassing conduct by the former boyfriend toward the employee that occurred within the employee's workplace was when the former boyfriend sent 39 emails within a month-and-a-half period to the employee at her state email address. *Id.* at 94, 107. The remainder of the harassment occurred away from the workplace. *Id.* at 94. The federal district court concluded that the employer could not be held liable for a hostile

work environment based on the ex-boyfriend's harassment that "occurr[ed] indisputably outside of the workplace." *Id.* at 103.

*Bodman* is the most factually similar case that the County cites because it includes a mix of harassment that occurs away from the workplace and a source of harassment within the workplace via some method of communication. And it suggests that Smith's actions away from the workplace—his physically stalking LaRose at the pierogi shop, the parking garage, and her home—cannot be the basis of a hostile work environment claim against the County.

The parties also cite *Holmes v. Utah, Department of Workforce Services*, 483 F.3d 1057, 1068 (10th Cir. 2007), a case that also addresses off-site harassment by a nonemployee. *Holmes* also supports the conclusion that harassment by a nonemployee who does not have a professional connection to the workplace, and that occurs away from work premises, cannot form the basis of a hostile work environment claim.

*Holmes* involved a supervisor who was sanctioned based on his sexual harassment of employees in the workplace; retired the next year, but continued to frequent the workplace because his wife worked there; and a year after that was barred from the premises after new allegations of harassment were raised. 483 F.3d at 1060. Several employees sued the employer for hostile work environment. *Id.*

On appeal, the Tenth Circuit addressed whether the acts that occurred the year after the supervisor's retirement, which consisted of him following one of the employees from the workplace to the post office and then grabbing her and frightening her, could support a hostile work environment claim. *Id.* at 1066, 1068. The court held that this act could not establish a hostile work environment in part because it "did not occur on the premises of the employer, or otherwise

in connection with [the employee's] work, and did not involve a fellow employee or supervisor." *Id.* at 1068.

The court noted that the employees had not cited any cases establishing that an employer has "a duty under Title VII to protect employees off the work premises from the conduct of nonemployees, even if such conduct may be found to be severe in its sexual overtones." *Id.* And it stated that "[t]he fact that [the former supervisor] may have committed an assault or some other tort against [an employee] off the work premises does not automatically translate into a Title VII violation by her employer." *Id. Holmes* supports the County's argument that Smith's off-site behavior following the termination of LaRose's representation cannot establish a hostile work environment.

The County also argues that limiting the harassment claim to harassment in the workplace is appropriate because it is the "employer's duty under the WLAD is to ensure a *workplace* free of discrimination" and because the only area of control an employer has is the workplace. Br. of Appellant at 18 (emphasis added). As noted above, the County admits that "[o]ff-site work events, such as business meetings, or other environments akin to the workplace where the employer exerts control are effectively 'in the workplace' and can form the basis for a [hostile work environment claim.]" *Id.* at 17 n.6. The County is correct that the purpose of hostile work environment claims under WLAD is to end discrimination *in the workplace and its off-site equivalents*, not to protect

employees from all possible injury remotely related to employment.[23] *Antonius*, 153 Wn.2d at 259; *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008); *see also* RCW 49.60.010 (purpose of WLAD is eliminate and prevent discrimination in employment).

Additionally, *Bodman*, *Holmes*, and the EEOC regulation's use of the language "in the workplace" support the County's argument that the hostile work environment claims are intended to address claims of harassment within the work environment rather than off-site harassment not connected to the workplace or an existing work-relationship. When a nonemployee with no existing relationship with the employer engages in harassing behavior away from the workplace or broader work environment, the employer has no direct control over the situation and liability would be inappropriate.[24]

---

[23] The County cites several cases that are either inapposite because the harassment occurred on work premises or at work-related events and/or between coworkers or that rely on *dicta*. *See, e.g.*, *Powell v. Las Vegas Hilton Corp.*, 841 F. Supp. 1024, 1025-26 (D. Nev. 1992); *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002); *Stoner v. Ark. Dep't of Corr.*, 983 F. Supp. 2d 1074, 1084 (E.D. Ark. 2013); *Whitaker v. Carney*, 778 F.2d 216, 217 (5th Cir. 1985).

In a statement of additional authorities, the County also refers us to *Barlow v. State*, 2 Wn.3d 583, 540 P.3d 783 (2024). But *Barlow* addresses whether a university has a special duty under tort law to protect its students from third-party conduct occurring off campus, and it discusses control in the context of determining whether the special relationship duty that applies to "K-12 schools" should also apply to universities given the different degree of control each of these entities has over their students. 2 Wn.3d at 590-92. Hostile work environment claims are not based on the special relationship doctrine, so *Barlow* is not informative.

[24] The County also argues that limiting hostile work environment claims based on nonemployee harassment to the workplace "is consistent with the general rule that employers have no duty to protect employees from hazards outside the workplace" under the common law. Br. of Appellant at 20). But the County does not explain how the lack of a common law duty precludes a statutory duty under WLAD.

Citing *Powell v. Morris*, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999), the County also argues that it is absurd to require an employer to control a criminal's behavior. But the County overstates *Powell*.

*Powell* involved a hostile work environment claim brought by a secretary in a correctional institution. *Powell*, 37 F. Supp. 2d at 1013. The court stated, "Courts have repeatedly declined to impose sexual harassment liability upon correctional institutions for the sexually offensive conduct of inmates, as long as the defendant institution took proper preventative and remedial steps with regard to inmate behavior." *Id.* at 1017. It further stated,

> The propensity of courts to decline imposing liability for prisoner acts is based on solid logical and practical foundations: anyone who works at a prison, particularly in a position with frequent inmate contact, must expect some off-color interactions. Prison employees inherently assume the risk of some rude inmates. It is absurd to expect that a prison can actually stop all obscene comments and conduct from its inmates—people who have been deemed unsuited to live in normal society. The most we can expect and require prisons to do is to implement and enforce policies reasonably calculated to minimize such harassment and protect the safety of its employees.

*Id.*

Although *Powell* suggests that the nature of the work environment as a whole should be considered when determining whether harassing behavior results in a hostile work environment, it does not address harassment that occurs outside of the work environment. Accordingly, *Powell* is not helpful to the County.

b. LaRose's Arguments

LaRose argues that harassment occurring away from work premises can establish a hostile work environment when, under the totality of the circumstances, "it has a nexus to the work environment." Revised Br. of Resp't at 46. This nexus requirement is satisfied, according to

LaRose, if "[b]ut for her employment as a public defender," she would not have experienced the harassing behavior. *Id.* She cites *Glasgow*, *Antonius*, and *Doe v. Oberweis Dairy*, 456 F.3d 704, 715 (7th Cir. 2006), to support her argument.[25]

*Glasgow* and *Antonius* merely establish that "[w]hether the harassment *at the workplace* is sufficiently severe and persistent to seriously affect the emotional or psychological well being of an employee is a question to be determined with regard to the totality of the circumstances." *Glasgow*, 103 Wn.2d at 406-07 (emphasis added); *Antonius*, 153 Wn.2d at 261. And because all of the harassment at issue in both cases was on-site, the courts in *Glasgow* and *Antonius* had no reason to consider whether off-site harassment by a nonemployee could provide grounds for a hostile work environment claim. *Glasgow*, 103 Wn.2d at 402-403; *Antonius*, 153 Wn.2d at 259-60. And in *Oberweis Dairy*, the off-site act occurred during an ongoing work-relationship between a supervisor and an employee. 456 F.3d at 716. Thus, these cases do not support the conclusion that all that is required to establish a hostile work environment claim is some nexus to the worksite or but-for causation.

LaRose also directs this court to an excerpt from an article in The DIGEST of Equal Employment Opportunity Law that briefly discusses off-site sexual and racial harassment claims. The article cites several cases discussing the "[e]merging issue[]"of harassment claims based on conduct outside the workplace and concludes:

> These decisions demonstrate that courts may apply a totality of the circumstances approach when determining employer liability for employees' conduct outside the workplace. The fact that harassment is carried out at a location other than the

---

[25] Citing *Glasgow*, 103 Wn.2d at 406 n.2, LaRose states that "Title IX" cases are instructive to the application of WLAD. Revised Br. of Resp't at 46. But *Glasgow* refers to Title VII, not Title IX. 103 Wn.2d at 406 n.2.

workplace may not be enough to protect employers from liability if there is a nexus between the alleged harassing activity and the workplace.

Jacob Workman et al., *The Law of Harassment: Assisting Agencies in Developing Effective Anti-Harassment Policies*, 25 DIG. EQUAL EMP'T OPPORTUNITY L., no. 3 (Summer 2014), https://www.eeoc.gov/federal-sector/digest/digest-equal-employment-opportunity-law-70#titlevii [https://perma.cc/8CGZ-9A4B].

LaRose refers us to three of the cases discussed in the digest article: *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 392, 409 (1st Cir. 2002); *Dowd v. United Steelworkers of Am., Loc. No.* 286, 253 F.3d 1093, 1102 (8th Cir. 2001); and *O'Rourke v. City of Providence*, 235 F.3d 713, 724 (1st Cir. 2001). But these cases can be distinguished because, unlike here, they address off-site harassment by coworkers that was related to ongoing harassment within the workplace. *Crowley*, 303 F.3d at 398-400; *Dowd*, 253 F.3d at 1101; *O'Rourke*, 235 F.3d at 724.

LaRose also contends that our supreme court's negligence analysis in *N.L. v. Bethel School District*, 186 Wn.2d 422, 378 P.3d 162 (2016), is analogous to this case. She contends that *N.L.* establishes "that the relevant inquiry is *the location of the negligence*, not the location of the injury," and that this "is no different as to the location of the conduct creating the hostile work environment," specifically, the County's failure to act. Revised Br. of Resp't at 47.

In *N.L.*, our supreme court held that a negligence claim against a school district could proceed in a case where a junior high school student was raped off campus during school hours by a high school student whom the district knew was a registered sex offender. 186 Wn.2d at 425-26. The court held that the relevant issue was whether the breach of the school district's duty to protect children from foreseeable risks of harm occurred when the students were on school grounds, regardless of where the injury occurred. *Id.* at 435. The court held that "districts have a duty of

31

reasonable care toward the students in their care to protect them from foreseeable dangers that could result from a breach of the district's duty. While the location of the injury is relevant to many elements of the tort, the mere fact the injury occurs off campus is not by itself determinative." *Id.*

But LaRose's negligence claim is not at issue. And, unlike the school district's duty in *N.L.*, the County's duty under WLAD is not to protect its employees from any foreseeable harm, regardless of where it occurs. Rather, the employer's duty under WLAD is to ensure that the employee is not subject to a hostile work environment. *Antonius*, 153 Wn.2d at 259; *see also* RCW 49.60.010 (purpose of WLAD is to eliminate and prevent discrimination in employment). *N.L.* does nothing to expand that duty.

### c. Amici's Arguments

Amici argue that WLAD protects employees from harassment that occurs by nonemployees. That issue was resolved in *LaRose*, so it need not be further addressed in this appeal.

Amici also argue that there is Title VII precedent that establishes that the nonemployee harassment need not occur on the employer's physical premises. Amici cite *Lapka*, 517 F.3d at 983. In *Lapka*, the sexual harassment occurred when the employee was raped by a coworker after socializing following a mandatory off-site training session. 517 F.3d at 978-79. Although *Lapka* demonstrates that the workplace need not be confined to the physical facility where the employee works, it shows only that harassment in the workplace can include harassment between coworkers that occurs during work-mandated activities held off-site. But in LaRose's case, with regard to the off-site, post-representation harassment, there was no ongoing coworker relationship, any

professional relationship had been severed, and the off-site harassment did not occur during a work-related event. Thus, *Lapka* is not instructive.

Amici also cite *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 60, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). But *Meritor Savings Bank* addressed sexual harassment of a bank employee by a supervisor that occurred both on and off the work-premises while the harassment victim was employed, and the location of the harassment was not at issue in the appeal. 477 U.S. at 60. Accordingly, *Meritor Savings Bank* is not helpful to LaRose.[26]

Amici also argue that some state appellate courts recognize that conduct occurring outside of the workplace can " 'permeate the workplace' " and can " 'contribute[ ] to the hostile work environment.' " Amicus Brief (AB) at 12-13 (quoting *Blakey v. Cont'l Airlines*, 164 N.J. 38, 56-58, 751 A.2d 538 (2000)). They quote *Blakey*, 164 N.J. 38, and cite *Doe v. Capital Cities* (1996) 50 Cal. App. 4th 1038, 58 Cal. Rptr. 2d 122. *Blakey* is not persuasive, and *Capital Cities* weighs against LaRose's argument.

In *Blakey*, the New Jersey Supreme Court addressed whether an employer could be liable on a hostile work environment claim based on online harassment by coworkers within an electronic forum available on a work-related electronic bulletin board. 164 N.J. at 48-54. The court determined that even though the electronic forum was not part of the physical workplace setting, harassment within the forum could support a hostile work environment claim if the electronic forum was "closely related to the workplace environment and beneficial to [the employer]." *Id.* at

---

[26] Amici also cite *Ratliff v. United States Postmaster General*, No. 2:06-cv-00115, 2008 WL 11450458 (S.D. Ohio Feb. 1, 2008), an unpublished district court opinion. But, again, *Ratliff* and the cases on which it relies all involved harassment by a coworker or work supervisor during an existing employment relationship.

46. Acknowledging that "[c]onduct that takes place outside of the workplace has a tendency to permeate the workplace," the court held that such communications could be grounds for a hostile work environment claim if the electronic bulletin board was "sufficiently integrated with the workplace" that it "should be regarded as a continuation or extension of the pattern of harassment that existed in the [employer's] workplace." *Id.* at 57-61.

Again, unlike here, *Blakey* involved harassment by coworkers. And the court in *Blakey* does not state that all harassment occurring away from the physical workplace with the potential to permeate the workplace creates a hostile work environment. The court states that it can do so if the location of the harassment is sufficiently related to the workplace environment that it should be considered an extension of the workplace. Here, Smith's physical harassment took place at locations (the pierogi shop, the public garage, and LaRose's home) that were not an extension of the workplace. And although Smith's harassing behavior may have started in the workplace, his later acts of physical stalking LaRose were not integrated into the workplace.

In *Capital Cities*, an actor brought a hostile work environment claim against a casting director who raped the actor in his home during the period of time in which the actor and the casting director had been engaging in activities that were intended to lead to an employment contract. 50 Cal. App. 4th at 1042-43. The California Court of Appeal addressed whether the fact the harassing behavior occurred in the casting director's home outside of normal work hours precluded the hostile work environment claim. *Id.* at 1047-48.

The court concluded that the harassing behavior did not have to occur on the worksite because the nature of the business relationship did "not conform to the limited and traditional [ ] process" that was common in other industries and was "not necessarily limited to a fixed cite." *Id.*

at 1050-51. The court stated, "All that is required is a showing of a legally sufficient nexus between the employment relationship and the act of harassment. That is, as long as the harassment occurs *in a work-related context*, the employer is liable." *Id.* at 1051 (emphasis added). Additionally, in analogizing to tort law, the court noted that a "but-for" causation would *not* be sufficient to establish liability and that there had to be "a causal nexus between the [act] and the employee's work." *Id.* at 1049.

*Capital Cities* undermines LaRose's argument that all that was required to hold the County responsible for Smith's off-site, post-representation behavior was a but-for nexus to the workplace. Instead, in *Capital Cities*, the court required that the harassment in some way relate to the employment relationship. *Id.* at 1050. And because LaRose's representation of Smith had terminated, Smith's physical stalking did not occur in a work-related context.

Amici also assert that courts have held employers accountable for failing to remedy harassment under circumstances similar to those here. Amici cite to *Christian v. Umpqua Bank*, 984 F.3d 801, 806-07 (9th Cir. 2020), to support this assertion.[27]

In *Umpqua Bank*, a bank employee brought a hostile work environment action against her employer after a bank customer stalked and harassed her in her workplace and at an employer

---

[27] Amici also cite *McGuinn-Roe v. Foster's Daily Dem.*, No. 94623-SD, 1997 WL 669965 (D. N.H. July 10, 1997), an unpublished federal district court order. *McGuinn-Rove* featured a mixture of on-site and off-site sexual harassment by one coworker toward another. 1997 WL 669965 at \*1. The court noted that the off-site harassment "may have formed part of a pattern of such harassment," and could "be relevant to the issue of whether plaintiff experienced a hostile environment at her place of work." *Id.* at \*3. But the inclusion of the off-site harassment in *McGuinn-Rove* was based on the fact the harassment was perpetrated by a coworker whom the harassed employee was forced to encounter regularly in the workplace. Because Smith was not LaRose's coworker and there was no business relationship requiring LaRose to maintain any kind of contact with Smith, *McGuinn* is unhelpful to LaRose.

sponsored charity event. 984 F.3d at 805-08. Although *Umpqua* is one of the few cases involving harassment by a nonemployee, the circumstances in *Umpqua* are not similar to the those in this case because the contacts with the nonemployee stalker all occurred while the nonemployee had an active business relationship with the employer and they all occurred on work premises or when the employee was representing her employer at an off-site function. *Id.*

Amici further contend that "denying workers protections from harassment by third parties when it takes place outside a physical workplace ignores the realities of sexual harassment and the parameters of myriad work environments." AB at 14 (boldface omitted). They argue that it is now common for workplaces to extend beyond the confines of the traditional office and that "an employer's responsibility to ensure a work environment free of discrimination, including sexual harassment, does not end at the office door, but rather extends to other locations where an employee may interact with colleagues, customers, or clients." *Id.* at 14-15. Amici is correct that hostile work environment claims are not restricted to on-premises harassment or to harassment solely by coworkers. But the crux of this issue is not just that Smith's physical harassment occurred outside of the work premises or that he was a client rather than a coworker. It is whether off-site acts by someone with *no remaining professional relationship* to the employer or employee can be the basis of a hostile work environment claim when the harassment bears no relationship to the past professional relationship.

Amici also refer us to an article stating that a significant percentage of sexual harassment cases address conduct occurring outside of the workplace, Ann Juliano & Stewart J. Schwab, *The Sweep of Sexual Harassment Cases*, 86 CORNELL L. REV. 548, 563 (2001). The article reviews approximately 650 cases and determines that 23 percent of those cases involved allegations of

36

harassment that did not occur at the work-site. Juliano & Schwab, *supra*, at 549-50, 563. It concludes that 35 of those 650 cases involved "non[-]consensual, off-premises conduct, such as phone calls, letters, or visits to the victim's home." *Id.* at 563. But the article does not reveal whether these contacts were by coworkers or non-coworkers, or whether they occurred during a professional or business relationship or after such a relationship had terminated, so the article does little more than confirm that off-site harassment is not uncommon.

Quoting *Parrish v. Sollecito*, amici point out that harassment that occurs off-site can have consequences that "may be felt in the victim's 'workplace' or 'work environment.' " AB at 18 (quoting 249 F. Supp. 2d 342, 344-46 (S.D.N.Y. 2003)). But, *Parrish* involved harassment by a coworker or supervisor during the period of employment so, unlike here, the employee was forced to continue to encounter her harasser at the workplace. Any stressor can potentially have consequences in the employee's workplace, but that does not mean that the employer has the responsibility to protect the employee from all stressful events.

Amici argue that liability should extend to employees who, like LaRose, "only interacted with [their] harasser because of [their] employment relationship" when the employer fails to take sufficient remedial action to prevent the harassment from "escalating to include conduct outside the physical workplace." *Id.* at 18-19. But amici does not cite to any authority demonstrating that this is the rule. They cite only *Oberweis Dairy*, which involved harassment during the period of employment. 456 F.3d at 716.

d.      Discussion

Although there is little direct authority addressing whether under WLAD a nonemployee's conduct outside of the work environment after the termination of a professional relationship can create a hostile work environment, persuasive authority demonstrates that the answer is no.

There is little case law discussing harassment by nonemployees away from the work environment. But 29 C.F.R. § 1604.11(e)'s express reference to "in the workplace" and *Bodman* and *Holmes* weigh in favor of concluding that WLAD does not require employers to ensure that their employees are free of non-work-related sexual harassment by nonemployees outside of the work environment. And because Smith's physical stalking of LaRose took place entirely off work premises and not during any work-related off-premises activity, after his professional relationship with LaRose and the County had ended, and did not relate to LaRose's representation of Smith beyond the fact her representation put Smith in contact with LaRose, the facts do not demonstrate that Smith's off-site harassment was in the workplace.

LaRose and amici do not cite any authority contradicting *Bodman* and *Holmes*. And although LaRose contends that she would not have been harassed by Smith but for her contact with him through her representation, *Capital Cities* suggests that but-for causation is not sufficient to establish liability. 50 Cal. App. 4th at 1049. In that case, the court held that but-for causation was insufficient and that there had to be "a causal nexus between the [harassment] and the employee's work."[28] *Id.* at 1049. Because LaRose's representation had ended, her employment no

---

[28] The County also contends that if a "but-for" nexus was all that was required, an employer could potentially be liable for hostile work environment claims arising from harassment at any location by anyone the employee met at work. Reply at 7. The County appears to be correct, and it is unlikely that such an absurd result would be intended.

longer required Smith to have any contact with LaRose or anyone else in the workplace. Thus, there was no causal nexus.

Additionally, although the facts of this case are disturbing, in the end the purpose of WLAD hostile work environment claims is to end discrimination in the work environment, not to protect employees from all possible injury remotely related to employment. *Antonius*, 153 Wn.2d at 259; *see also* RCW 49.60.010 (purpose of WLAD is to eliminate and prevent discrimination in employment). Imposing liability for personal harassment unrelated to the employment that occurs in locations not related to the harassment victim's employment does not further that purpose.

We hold that the trial court erred by not dismissing the portion of the hostile work environment claim against the County based on Smith's post-representation, off-site harassment of LaRose because it was not in the work environment and it was not related to her work.

D.      Post-Representation Acts of Third Party Within the Workplace

We must also address the fact that some of Smith's post-representation harassment was connected to the workplace because he continued to call LaRose at work. We hold that, even assuming that the County could be held liable based on Smith's post-representation phone calls, the trial court erred by not dismissing the portion of the hostile work environment claim based on the post-representation phone calls because LaRose did not present evidence establishing that the County's response to the calls was inadequate.

29 C.F.R. § 1604.11(e) states that when the harasser is a nonemployee and the harassment is in the workplace, the EEOC "will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees" when determining if the employer is responsible for the nonemployee's acts. Smith's

post-representation conduct within the workplace consisted entirely of phone calls. Although these calls had no further relevance to Smith's representation and the County had no control over Smith's actions, the County was still aware that he was calling LaRose in the office and harassing her after July 26, 2013, and it had some ability to control Smith's access to LaRose in the workplace. Thus, it is possible that the County could be subject to a hostile work environment claim based on the continuing calls in the workplace.

However, we hold that the trial court should have dismissed the portion of the claim based on Smith's post-representation phone calls because there was no evidence that the County failed to adequately address this harassing behavior.

When addressing workplace harassment, the employer has a duty "to take prompt action reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 813 (7th Cir. 2001). "[T]he fact that an employer's efforts do not actually succeed in stopping or preventing the harassment is not determinative." *Mod. Cont'l/Obayashi v. Mass. Comm'n Against Discrimination*, 445 Mass. 96, 109, 833 N.E.2d 1130 (2005). The focus is not on whether the employer's remedial action was successful but, rather, " ' whether the employer's total response was reasonable under the circumstances as then existed.' " *Id.* (quoting *Berry*, 260 F.3d at 811).

Furthermore, the employer is not "required to take what would, with hindsight, be considered better or more effective measures." *Id.* "[A] plaintiff does not establish an employer's liability merely by showing that the employer 'could have done more.' " *Id.* (quoting *Berry*, 260 F.3d at 813). Instead, "the plaintiff must show 'that the steps that [the employer] actually took

were not reasonably likely to prevent the harassment from recurring.' " *Id.* (alteration in original) (quoting *Berry*, 260 F.3d at 813).

The County provided LaRose with a means to avoid Smith's calls because she was able to screen them. And because Smith was no longer a client, LaRose was under no obligation to listen to the messages or calls or to interact with Smith. In fact, by October or November 2013, LaRose was actively screening her calls to avoid contact with Smith. Because Smith's only workplace contact with LaRose was his calls, this response was reasonable under the circumstances that existed and it was likely to prevent Smith's harassment in the workplace.

There were certainly other actions the County could have taken to prevent Smith from calling LaRose at work, such as redirecting all of LaRose's calls through reception to ensure that none of his calls went to her voicemail or seeking an antiharassment order that would preclude Smith from contacting the County. But the fact the County could have provided different relief is irrelevant because the call screening mechanisms were reasonably likely to prevent Smith's on-site harassment, which consisted entirely of his calls.

We hold that the trial court also erred by not dismissing the hostile work environment claim against the County to the extent it was based on Smith's post-representation phone calls to LaRose at her office because LaRose did not present evidence establishing that the County failed to take reasonably prompt and adequate corrective action. *Glasgow*, 103 Wn.2d at 407.

E.      County Liability During the 26-Day Period of Representation as a County Employee

        1.      Terms and Conditions of Employment

The County asserts that the trial court erred when it failed to dismiss the hostile work environment claim against the County based on the harassment that occurred during the 26-days

that LaRose represented Smith while she was a County employee. The County argues that although LaRose may have continued to receive unwanted phone calls from Smith during this time period, nothing in the record shows that Smith's contacts changed once the County became LaRose's employer and that the evidence failed to demonstrate that Smith's alleged harassment during that brief period affected the terms and conditions of LaRose's employment.[29] We agree.

As stated above, to establish her hostile work environment claim against the County, LaRose had to establish that Smith's harassing behavior affected the terms and conditions of her employment. *Antonius*, 153 Wn.2d at 261. Factors that the courts consider when "determining if a hostile work environment claim affects the terms and conditions of employment are the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance." *LaRose*, 8 Wn. App. 2d at 111-12.

Although the County's alleged failure to intervene with Smith may have resulted in LaRose continuing to represent him during this short period of time, nothing in the record suggests that Smith's alleged harassment during this time escalated or that it interfered with LaRose's work performance or otherwise altered the terms and conditions of her employment during that 26-day period. Accordingly, the trial court erred when it refused to grant the County's motion for a

---

[29] The County also contends that because the facts related to the harassment did not change during the brief period of time LaRose represented Smith as a County employee and the jury rejected the hostile work environment claim against TDA, there were no grounds to find for LaRose on her claim against the County between July 1 and July 26, 2013. The County argues that the jury's verdict exonerating TDA means that the jury must have based its guilty finding on the post-representation harassment. But we are reviewing the trial court's decisions on the County's pre-verdict motions, so the trial court would not have been aware of the verdict when it made those decisions. Accordingly, we do not consider the verdict in favor of TDA when examining whether the trial court erred by not dismissing the hostile work environment claim against the County.

judgment as a matter of law in regard to the 26-day period of time in which LaRose represented Smith as a County employee.

2.      Prompt and Adequate Corrective Action

The County also argues that the trial court erred in denying the County's motions because the evidence showed that the County took reasonably prompt and adequate corrective action to end the workplace harassment during the 26-day period that LaRose represented Smith as a County employee.

The County contends that the trial court's removal of LaRose from Smith's case was an adequate corrective action. We agree.

Removal from the case was an appropriate response to Smith's harassment. During this 26-day period of time that LaRose represented Smith as a County employee, as evidenced by her prior request to have the case reassigned, LaRose was aware that withdrawing from the case was an option. Although she had previously chosen not to exercise that option, once the decision was made to end her representation, that decision was executed within a week.

Although a 26-day period of representation could arguably be a long period of time if all the County had to do was substitute LaRose with another public defender, LaRose cannot make this argument because the court's jury instruction 22 provided: "A Washington Court Rule provides that once a criminal case has been set for trial, no lawyer shall be allowed to withdraw from the case, except upon written consent by the court, for good and sufficient reason shown." CP at 10286. And because this instruction has not been challenged, it is the law of the case. *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 313, 372 P.3d 111 (2016).

Notably, LaRose's argument appears to be that the acts or omissions of her *prior* supervisors at TDA (who became her supervisors at the County) can somehow create liability for the County. But the trial court instructed the jury that "[i]n determining whether [LaRose] has proven the elements of a hostile work environment claim with respect to King County, you should consider acts or omissions of King County occurring" only during the time the County was LaRose's employer. CP at 10278 (Instruction 12). In the same instruction, the court also directed the jury to "decide the case against each Defendant separately as if it were a separate lawsuit." *Id.* Thus, this argument is precluded by the trial court's instructions to the jury.[30]

To circumvent this limitation, LaRose appears to argue that the moment the County took over, the County had the duty to address Smith's harassment based on *information* LaRose's supervisors had acquired before the County became her employer. This information includes the facts of Smith's prior and then-current stalking charges, the knowledge of Smith's boundary crossing with Lederer and Lederer's request for reassignment of the case, the fact Vernon apparently told Goldsmith that Smith's cases should never be assigned to a woman, and Smith's boundary crossing with LaRose during her employment with TDA.

This argument seems to suggest that once the County took over it should have, based on this knowledge, immediately and sua sponte reassigned Smith's case and that the County's failure to do so was an actionable act or omission by the County. But, even assuming this was true, as noted previously, LaRose was removed from the case within 26 days of the County becoming her

---

[30] Notably, we also concluded in LaRose's prior appeal that the County was not vicariously liable for TDA's conduct prior to July 2013 because TDA was acting as an independent contractor and not as an agent. *LaRose*, 8 Wn. App. 2d at 130.

employer, and there is no evidence that during this 26 days Smith's behavior altered any of the terms and conditions of her employment.

Accordingly, we hold that the trial court erred when it refused to grant the County's motion for judgment as a matter of law in regard to the period of time in which LaRose represented Smith as a County employee because there is no evidence that the County failed to take prompt and adequate corrective action.

F.      Summary and Remedy

We hold that the trial court erred when it denied the County's CR 50 motion to dismiss LaRose's hostile work environment claim to the extent it was based on (1) Smith's post-representation, off-site physical harassment, (2) Smith's post-representation phone calls, and (3) Smith's harassment during the 26-day period that LaRose represented Smith as a county employee. Accordingly, we hold that the trial court erred when it failed to dismiss LaRose's hostile work environment claim against the County and reverse the verdict and the related judgment and award of attorney fees.

We must next address whether this matter should be remanded for a new trial on LaRose's negligence claim against the County. The County asserts that remand for a new trial on the

negligence claim is precluded because the jury found that LaRose's related injuries were compensable under the IIA. LaRose does not respond to this argument.[31]

As we recognized in *LaRose*, under the IIA "employers generally are immunized from negligence liability" for injuries based on workplace injuries and occupational disease. *LaRose*, 8 Wn. App. 2d at 113-14. Thus, if LaRose suffered a workplace injury or occupational disease, she cannot also obtain relief based on a negligence claim against the County and remand is not required.

An occupational disease is "such disease or infection as arises naturally and proximately out of employment." RCW 51.08.140. "Claims based on mental conditions or mental disabilities caused by stress do not fall within the definition of an occupational disease." WAC 296-14-300(1). But, under WAC 296-14-300(2)(a), "[s]tress resulting from exposure to a single traumatic event will be adjudicated as an industrial injury." "[A]n 'injury' is a 'sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom.' " *LaRose*, 8 Wn. App. 2d at 114 (quoting RCW 51.08.100).

The County contends that because the jury found by special verdict that LaRose suffered from a mental health condition and that "on a more probable or not basis that this condition was

---

[31] LaRose unsuccessfully brought an IIA claim as an occupational disease claim, and she stipulated that "her mental conditions were not the result of a single traumatic event but, rather, the result of the cumulative effect from repeated traumatic events." *LaRose v. Dep't of Lab. & Indus.*, 11 Wn. App. 2d 862, 866, 456 P.3d 879 (2020). Neither party discusses how or if the resolution of her IIA claim in any way effects the decision on her negligence claim. But as long as the IIA *covers* an injury or disease, the bar applies even if the claimant fails to meet the burden of proof on some component of the claim and therefore cannot actually obtain compensation under the IIA *LaRose*, 8 Wn. App. 2d at 114.

the result of a single traumatic event," it found that she suffered an industrial injury and the IIA bars any recovery on her negligence claim so remand is not required. Br. of Appellant at 79; CP at 10300. We agree.

In this context, "an 'injury' is a 'sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom.' " *LaRose*, 8 Wn. App. 2d at 114 (quoting RCW 51.08.100). The jury found that LaRose's mental health condition was the result of a single traumatic event. Although a finding that a plaintiff experienced a single traumatic event alone would not necessarily establish an industrial injury, it does in this instance because the jury instructions required the jury to find that the relevant event was "sudden and produce[d] an immediate or prompt result" in order to find the mental health condition was caused by a single traumatic event. CP at 10291 (Instruction 27).

Because the IIA precludes LaRose's recovery on her negligence claim against the County, remand is not required.

## ATTORNEY FEES ON APPEAL

LaRose requests "appellate fees" under RAP 18.1(b) and RCW 49.60.030(2). Revised Br. of Resp't at 78. Because LaRose is not the prevailing party, we deny her request for fees.

## CONCLUSION

We reverse the trial court's denial of the County's CR 50 motion to dismiss the hostile work environment claim and remand for dismissal of that claim.

No. 56455-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

GLASGOW, J.

VELJACIC, J.